JUDGE TORRES

25 CV 02150

## Verified Complaint Table of Contents

Other attached documents included:
- Verified Statement in Support of Complaint signed by Plaintiff Darius L. Goodworth
- Exhibits Marked A1 to A51



| Page Numbers | Section |
|---|---|
| 1 - 7 | Preliminary Statement |
| 8 | Basis for Jurisdiction & Venue |
| 9 - 10 | Parties Information |
| 10 - 65 | Factual Background |
| 65 - 85 | Claims for Relief |
| 85 - 86 | Exhibit Summary |
| 86 - 87 | Prayers for Relief |
| 88 - 92 | Exhibits Table of Contents |



25 CV 02150

JUDGE TORRES

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PERSEPHONE DOLCE,
DARIUS GOODWORTH,

              Plaintiffs,

      -against-

CERTIFIED LUXURY MOTORS,
CLM AUTO GROUP, INC.,
WORLDWIDE LUXURY ENTERPRISES INC.
DBA CERTIFIED LUXURY MOTORS,
ALLY FINANCIAL INC.,
NORTH SIDE CAR CARE CORPORATION,
FAWAD AWAN, JOHN DOE'S 1-3,
JANE DOE,

             Defendants.

**VERIFICATION STATEMENT
IN SUPPORT OF COMPLAINT**

U.S. DISTRICT COURT
FILED
MAR 1 4 2025
S.D. OF N.Y.

      I, Darius Goodworth declare under penalty of perjury under the laws of the United States of America that the foregoing complaint is true and correct to the best of my knowledge, information and belief.

      I understand that I am subject to the penalties of perjury if I make any false statements in this verification.

Executed on 3 14 2025, at New York, NY.


Darius L. Goodworth

DARIUS L. GOODWORTH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PERSEPHONE DOLCE,
DARIUS L. GOODWORTH,

        Plaintiffs,

    -against-

CERTIFIED LUXURY MOTORS,
CLM AUTO GROUP, INC.,
WORLDWIDE LUXURY ENTERPRISES INC.
DBA CERTIFIED LUXURY MOTORS,
ALLY FINANCIAL INC.,
NORTH SIDE CAR CARE CORPORATION,
FAWAD AWAN, JOHN DOE'S 1-3,
JANE DOE,

        Defendants.

**VERIFIED COMPLAINT
JURY TRIAL DEMANDED**

Plaintiffs Persephone Dolce and Darius Goodworth, proceeding pro se, as and for their Verified Complaint, respectfully allege:

## PRELIMINARY STATEMENT

Plaintiffs bring this action due to the Defendants acting in concert, and engaging in actions that have caused financial harm to the Plaintiffs, through their auto inspection, sales, and financing scheme within the New York City metropolitan area. Defendants demonstrate a heinous pattern of fraudulent, deceptive, and unlawful business practices violating the Racketeer Influenced and Corrupt Organizations Act ("RICO") and several related federal and state laws.

Defendants' scheme was particularly insidious as this scheme has been allowed to continue unchecked for almost a decade. Behind the illusion of luxury and zip codes of prestige lies nothing but smoke, mirrors, and a well-orchestrated scam—where the only thing "certified" is deception. At the core of this scheme, Certified Luxury Motors ("CLM"), purportedly backed by Ally Financial Inc. ("Ally"), a digital bank and lender, baited Plaintiffs with online listings of luxury vehicles at fair market value, promising reasonable financing terms. However, upon arrival, an associate informed consumers that the advertised vehicle was unavailable and were subjected to an exhaustive, coercive sales process akin to a war of attrition, enabling emotional and intellectual manipulation to be effective.

A seemingly friendly sales associate—whose primary objective was to build false trust—leveraged high-pressure tactics, rapid subject changes, and conflicting statements to distract and disorient the consumer, preventing them from closely examining the deal's financial terms. In a particularly egregious and calculated exploitation, the sales associate invoked her deceased parent to fabricate a bond with a grieving Plaintiff, weaponizing personal tragedy to disarm and gain the Plaintiff's confidence. Meanwhile, she inflated the transaction with exorbitant and unsubstantiated fees, including an unlawful double down payment, ensuring that Plaintiffs unknowingly paid thousands more than advertised. The associate finally allowed them a rushed and restricted test drive, cutting it short under the suspicious excuse of night vision concerns. Defendants ensured the consumer had no real opportunity to assess the vehicle's condition.

Once sufficiently misled, the Plaintiffs were ushered into the Finance Manager's office, where the scam escalated under the guise of expertise. In a disgraceful abuse of trust, the Finance Manager exploited his military service to project credibility and honor while fabricating

unwarranted fees, increasing the interest rate, and falsely blaming traditional banks for unfavorable loan terms that he purportedly underwrote. The Finance Manager then pressured the Plaintiffs into believing that a credit union would offer better terms for nurses, masking the true intent of the scheme—to accelerate a full loan payoff and ensure that both the dealership and Ally Financial extracted their fraudulent profits immediately while avoiding scrutiny.

Ally Financial was not a mere third-party lender but an active enabler of this fraudulent enterprise. Ally did not correctly underwrite or verify the validity of the loans it purportedly purchased, instead unquestioningly acquiring contracts from CLM, granting the transactions an undeserved air of legitimacy. Ally Financial Inc. has established a pattern of alleged deceptive and discriminatory financial practices, making it a repeated offender in auto financing misconduct.

In 2013, the company entered into consent orders with the Consumer Financial Protection Bureau (CFPB) and the U.S. Department of Justice (DOJ) after being accused of discriminatory lending practices that resulted in higher costs for certain protected classes, ultimately paying $98 million in penalties and settlements. As part of the consent orders, Ally was required to implement proper oversight and monitoring of dealer pricing practices to ensure compliance with fair lending laws. However, rather than meaningfully addressing these issues, Ally Financial has continued to engage in deceptive lending schemes, as evidenced by its 2018 class action settlement for unlawfully imposing hidden fees on consumers purchasing their leased vehicles—another instance of the company violating consumer protection laws for financial gain.

Despite its prior commitment to regulators and consumers, Ally has failed to implement the promised oversight, instead hoping that the public would not notice its ongoing misconduct. This pattern of noncompliance and repeat violations directly mirrors the allegations in the present case against Certified Luxury Motors, where Plaintiffs assert that Ally Financial has continued to engage in predatory lending and fraudulent auto financing schemes, including hidden fees, balloon loans, and refusal to investigate legitimate concerns of fraud. The company's repeated settlements and failure to enforce regulatory safeguards demonstrate a willful disregard for consumer protection, reinforcing the necessity for legal intervention.

Plaintiffs discovered that Defendant Certified Luxury Motors and their agents had manipulated the already illegal terms in an entirely different contract. Goodworth's signature was forged several times on the document submitted to Ally Financial Inc. Their entire operation was tactically designed to appear lawful but is blatantly criminal. Defendant Fawad Awan's companies strategically established themselves in affluent and middle-class neighborhoods, leveraging the location and business names like "Certified Luxury Motors" to create a façade of trustworthiness— a deliberate act to give unsuspecting consumers a false sense of prestige and legitimacy.

Plaintiffs were presented with an illusion that they had purchased a certified, rigorously inspected vehicle with a comprehensive warranty. Only to uncover the "125-point inspection" was a fabrication, the warranty fictitious, and the car itself riddled with numerous safety issues, culminating in a catastrophic tire failure on the FDR Drive at speeds exceeding 40 MPH—an incident that could have led to a multi-car accident or fatalities. Even when confronted, Certified Luxury Motors refused to assist. Before the manifestation of critical safety defects, Certified

Luxury Motors and its employees possessed actual knowledge of these inherent flaws yet proceeded with deliberate indifference.

Defendant Certified Luxury Motors engaged in a calculated and consistent campaign of misrepresentation, falsely assuring consumers that they had taken remedial action. In reality, they concealed the extent of the defects, resorting to patently deceptive measures, including the crude and juvenile application of spray paint on the vehicle's rims to disguise large cracks and prior repairs. This deliberate act and prior knowledge of the defects constitute a clear and unconscionable breach of consumer trust. Such actions transcend mere negligence—the evidence points to a prioritization of profit over consumer safety, demonstrating a callous willingness to endanger the public. This reflects a growing pattern of corporate misconduct in which businesses disregard public welfare with minimal accountability.

Even more alarming is that a New York State-certified repair shop participated in this scheme by approving vehicles that did not meet Department of Motor Vehicles standards. Allowing Certified Luxury Motors to evade costly repairs while unloading hazardous vehicles onto unsuspecting buyers. North Side Car Care has participated in numerous inspections for CLM, acting as a rubber-stamp operation for unsafe vehicles. Upon being confronted regarding their involvement, they conceded not only that they barely touched Plaintiffs vehicle, but also that they were experiencing difficulties with Certified Luxury Motors also.

The full extent of physical harm or fatalities resulting from the Defendants' fraudulent vehicle inspections and sales remains unknown at this time, as numerous unsafe vehicles may still be on the road, posing an ongoing danger to unsuspecting drivers, passengers, and pedestrians. A preposterous notion given that New York City and Long Island are both notorious

for high-speed crashes and fatal accidents, making the Defendants' recklessness an imminent public hazard.

Fawad Awan, the head of this enterprise, has had his companies sued numerous times across multiple jurisdictions, both at the state and federal levels. These lawsuits have spanned various allegations, including fraudulent business practices, deceptive consumer transactions, and labor violations. Many of these cases remain pending, while others have resulted in settlements, further underscoring a pattern of misconduct and legal disputes surrounding his business operations.

Defendants racketeering was clear; acquire luxury vehicles with defects for cheap; have North Side Car Care pass the defective luxury vehicle inspection with New York State's DMV so Certified Luxury Motors could avoid paying for expensive repairs; sell the defective vehicle to consumers; trap consumers in predatory loans loaded with fabricated fees, inflated interest rates and financing charges; encourage victims to refinance quickly to ensure a swift loan payoff; if refinancing fails, leave consumers stuck in a highly profitable debt cycle, or worse, default; in the event of default, leverage the pre-installed LoJack tracking system to repossess the vehicle and pursue aggressive debt collection swiftly; and then repeat the process with subsequent unsuspecting consumers. All while regulators remain unaware of the scale of the operation.

Let there be no dubious presumption—Defendants' employees and agents are not shielded from personal liability, even if their leader commanded these actions. The doctrine of corporate veil-piercing ensures that those who knowingly engage in fraud cannot hide behind a business entity (JSC Foreign Economic Association Technostroyexport v. International Development and Trade Services, Inc., 306 F. Supp. 2d 482 (S.D.N.Y. 2004)). The law does not

reward willful blindness nor absolve those who, with full volition, defraud consumers. No amount of corporate posturing, fraudulent contract terms, or feigned ignorance shall exempt them from the reach of justice.

Defendants' conduct constitutes a racketeer-influenced corrupt organization. Plaintiffs seek full statutory damages under each law violated, treble damages where applicable, compensatory and actual damages to redress financial and personal harm, and punitive damages exceeding $5 million to deter future misconduct. Additionally, Plaintiffs demand the permanent closure of Certified Luxury Motors and North Side Car Care. Ordering the dissolution of any business owned by Fawad Awan and his agents and a subsequent ban from operating a company for at least 5 years within the region.

Plaintiffs also request a referral for an investigation into Ally Financial Inc. to determine the full extent of its involvement in fraudulent lending practices. Plaintiffs also request an order referring the potential criminal violations (that the Court deems appropriate) to law enforcement. Given the overwhelming amount of complaints and reviews sharing similar horror stories, Plaintiffs seek the establishment of a managed restitution fund to compensate victims defrauded by Certified Luxury Motors, Ally Financial Inc., North Side Car Care, and all of their agents and co-conspirators. This case is not simply about financial recovery but dismantling a calculated and ongoing criminal enterprise. Defendants' scheme is a deliberate and systemic racket, one that has endangered an unknown number of lives, and must be permanently dismantled through judicial and regulatory intervention.

## I.  <u>BASIS FOR JURISDICTION AND VENUE</u>

**a.  This Court has jurisdiction pursuant to:**

- **28 U.S.C. § 1331** – Federal question jurisdiction, as this action arises under the Racketeer Influenced and Corrupt Organizations Act (RICO) 18 U.S.C. § 1962 et seq., the Truth in Lending Act (TILA) 15 U.S.C. § 1601 et seq., and others.

- **28 U.S.C. § 1332(a)** – Diversity jurisdiction, as the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the parties.

- **18 U.S.C. § 1964(c)** – Civil RICO jurisdiction, granting this Court authority to hear claims under the Racketeer Influenced and Corrupt Organizations Act.

- **28 U.S.C. § 2201 & § 2202** – Declaratory judgment jurisdiction, empowering the Court to determine the rights and legal relations of the parties regarding the fraudulent and deceptive business practices alleged.

- **28 U.S.C. § 1367** - Supplemental jurisdiction over Plaintiffs' claims arising under New York State statutes and common law.

**b.  Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2),** as a substantial part of the events or omissions giving rise to the claims occurred within this District. One key event was the tire blowout incident, which occurred within this district. Although the defendants do not maintain physical offices within the SDNY, they regularly and knowingly conduct business with residents and workers of this district, including Plaintiff Dolce, a full-time resident of Manhattan, and Plaintiff Goodworth, a full-time worker in Manhattan.

## II. PARTIES

1. **Plaintiff Information.**

   a. Plaintiff, Persephone Dolce, is an individual residing in New York, NY.

   b. Plaintiff, Darius L. Goodworth, is an individual residing in Brooklyn, NY.

2. **Defendant Information.**

   a. Defendant Certified Luxury Motors (Facility #7122036) is a car dealer licensed by the New York State Department of Motor Vehicles, with its principal place of business at 105 Northern Blvd, Great Neck, NY, 11021.

   b. Defendant CLM Auto Group, Inc. upon information and belief, is the official incorporated name of Certified Luxury Motors in New York State.

   c. Worldwide Luxury Enterprises, Inc. doing business as Certified Luxury Motors, is the parent company and operator of the subsidiary Certified Luxury Motors, which functions as a luxury used car dealership. It was incorporated in New York State.

   d. Defendant Ally Financial Inc. DBA Ally Bank, headquartered at 500 Woodward Ave, Detroit, MI 48226, is the digital bank with which Plaintiff Darius Goodworth allegedly entered into a loan agreement.

   e. Defendant Fawad Awan is upon information and belief, the Chief Executive Officer of Worldwide Luxury Enterprises, Inc., Certified Luxury Motors (CLM), CLM Auto Group Inc., and a resident of the State of New York.

   f. Defendant North Side Car Care is a mechanic shop incorporated in New York State with a facility number of 7098670 at 145 Northern Blvd, Great Neck, NY 11021.

g. Defendant John Doe #1 is a Sales Manager employed by Certified Luxury Motors and, upon information and belief, a resident of the State of New York.

h. Defendant John Doe #2 is an employee of Certified Luxury Motors, serving as a Finance Manager, and upon information and belief, a resident of the State of New Jersey.

i. Defendant John Doe #3 is a Sales Manager employed by Certified Luxury Motors and, upon information and belief, a resident of the State of New York.

j. Defendant Jane Doe is an employee of Certified Luxury Motors, serving as a Sales Associate, and upon information and belief, a resident of the State of New York.

## III. FACTUAL BACKGROUND

3. On January 18, 2025, Plaintiffs decided they would purchase a luxury vehicle to address Dolce's travel requirements for safety and professional obligations, including her filmmaking project, which would take place in both Chautauqua County and New York County.

4. Goodworth agreed to finance the vehicle for her, as her age would have resulted in significantly higher costs and financial burdens. Goodworth also would use the car to commute to The Mount Sinai Hospital, where he is an Emergency Room Registered Nurse.

January 24, 2025

5. On January 24, 2025, at 10:57 AM, Plaintiff, Persephone Dolce, contacted Certified Luxury Motors to confirm the availability, readiness, 100-day warranty, 125-point

inspection (see Exhibit A1), and accurate pricing of a 2021 Mercedes-Benz A220 listed on Cars.com (see Exhibit A2). Certified Luxury Motors confirmed these details and scheduled an appointment for January 25, 2025, at 3:30 PM.

6.    On January 24, 2025, at 6:44 PM, Plaintiff, Persephone Dolce, contacted Certified Luxury Motors once more, following a prior "bait and switch" experience that same day with a Bronx dealership. Dolce sought explicit confirmation that the 2021 Mercedes-Benz A220 listed on Cars.com was available currently, ready for purchase, and accurately priced, stating, "No tricks or gimmicks, I already went through it tonight and don't have time for it tomorrow." Certified Luxury Motors again confirmed the vehicle's availability, readiness, and accurate pricing.

January 25, 2025

7.    On January 25, 2025, at approximately 3:30 PM, Plaintiffs, accompanied by Dolce's stepfather, arrived at Certified Luxury Motors located at 215 Northern Boulevard, Great Neck, NY 11021.

8.    John Doe #1 directed Plaintiffs' group to work with a sales associate temporarily identified as Jane Doe, as her full name is currently unknown.

9.    Jane Doe escorted Plaintiffs' group to a cubicle at the rear of the dealership. Plaintiff Goodworth then requested to view and test drive the 2021 Mercedes-Benz A220 for which he and Plaintiff Dolce had scheduled an appointment.

10.    Subsequently, Jane Doe advised Plaintiffs that the A220 was "in transit" and not available for purchase or test drive. She then proceeded to showcase alternative luxury automobiles in the showroom and on her Apple iPad.

11. Plaintiffs inquired about the discrepancy between Jane Doe's statement and the prior assurances given by the associate who answered the phone. Jane Doe expressed that this is a normal and frequent occurrence.

12. Plaintiffs then began viewing alternatives firmly pushed by Jane Doe, including a 2021 C300 and E-Class Mercedes-Benz, both significantly more expensive than the A-Class.

13. Plaintiffs considered an alternative momentarily but reaffirmed their preference for the A-Class.

14. Jane Doe then revealed the A220 wouldn't be available until January 28th and suggested a deposit to hold it for an exclusive test drive.

15. Jane Doe then pointed out an available 2021 Mercedes-Benz A35 AMG, a significantly different trim level than the originally discussed A220, located in the showroom. She highlighted its features, stating, "It's a nice car... with 61,000 miles and... 18-inch wheels..." The A35 AMG also had a significantly higher price than the A220 and significantly more mileage than the A220. Jane Doe affirmed that the dealership had acquired the car the previous week.

16. In response to a request, Jane Doe furnished the advertised listing price of $23,990.00. Dolce asked if the listed price was fixed, expecting that it was. Jane Doe stated "It's going to go up before it comes down, but I can get my all-in number, and then we can go from there."

17. Plaintiffs later discovered that it's illegal in New York State for a car dealership to raise the price of a vehicle already listed.

18. Dolce questioned the anticipated price and asked, "What are you thinking?" Jane Doe replied that she did not know and would need to consult her manager. She then urged the

Plaintiffs to inspect and test drive the car, assuring them that if they liked it, she would provide a transparent and fair breakdown of all costs.

19.    Despite Dolce's repeated requests to review pricing, Jane Doe insisted, "Get comfortable with the car because I want to make sure you like it," effectively delaying price negotiations. Even after a brief examination of the car's features, Jane Doe ignored Plaintiffs' request to discuss financing before a test drive.

20.    Dolce's stepfather observed that the rear rotors appeared "scored up" and suggested they might need replacement, citing a potential safety concern. Jane Doe dismissed this safety concern, stating that all vehicles undergo a "pre-certification" and "125-point inspection" upon arrival. This statement was in line with what Plaintiffs read on the website, so they didn't question this further.

21.    Jane Doe also asserted that they do not purchase vehicles with numerous owners or any accidents and that brakes, tires, and rotors are routinely checked during vehicle inspections. She further stated that the car had a 30-day dealership warranty, which was unlawful. Plaintiffs later learned that the vehicle was required to have a minimum 60-day written warranty under New York State law, as it had under 80,000 miles. Jane Doe then reiterated the precertification and 125-point inspection process, both of which the Plaintiffs relied upon.

22.    Plaintiffs and Jane Doe began discussing financing, during which Dolce's father questioned the "preparation charge". She deceptively asserted that all dealers, both new and used, impose these charges, claiming they are standard and often "not disclosed." Jane Doe then stated that the Mercedes Benz (manufacturer) standard preparation fee was $2,995, which was a misleading statement.

23.  Dolce attempted to negotiate, citing her stepfather's concerns. Jane Doe declined, assuring them Defendant Certified Luxury Motors addressed any issues through the complete PDI (Pre-Delivery Inspection), a statement the Plaintiffs relied upon. She then contradicted this statement by saying she'd noticed a potential problem with the rear tires, stating they would "probably need to do the tires…we'll take care of it…they kind of re-inspect the vehicle just to make sure before it goes," a statement the Plaintiffs also relied upon. Defendants had a duty to disclose the problems with the vehicle and provide a copy of the timed, dated, and detailed Pre-Delivery Inspection.

24.  Jane Doe proceeded to outline verbally the purported "normal fees," commencing with the $23,990.00 list price. She deceptively incorporated a $3,995.00 down payment into the loan, an inclusion not immediately detected by the Plaintiffs, thereby hiking the total loan amount. Subsequently, she enumerated a $3,495.00 Dealer Preparation fee, a $2,000.00 "Pre-Certification of Loan" fee (which Plaintiffs later discovered was unlawful), and a $1,596.00 "Pre-Delivery Inspection" fee (which Plaintiffs paid but never received a copy of the supposed inspection).

25.  These fees are not typical and were improperly disclosed in an attempt to confuse and deceive the Plaintiffs. Jane Doe declared the aggregate sum to be "$31,480.00" and proposed a $300.00 reduction from the "purchase price," resulting in $31,180.00. This constituted a $7,190.00 escalation above the advertised price, a price the Plaintiffs relied upon.

26.  Around 5:45 PM, John Doe #1 approached the Plaintiffs, attempting to secure a down payment for the vehicle. Plaintiffs, exhausted and sleep-deprived, had forgotten Jane Doe had a purported "down payment" wrapped into their selling price. They understood from

the website that a zero-down option was available due to Goodworth's excellent credit, a statement they relied upon.

27.     John Doe #1 then stated that they generally preferred not to offer zero-down loans, citing their status as a "bank-owned dealership. " This statement is false and misleading, as it contradicts state incorporation/ownership records and statements later made by Ally Financial Inc. representatives and managers.

28.     John Doe #1 continued to press for a down payment, stating, "Something to help out the cause, how are we doing?" Dolce inquired if taxes were being included in the loan and, if so, the dollar amount. John Doe #1 left to verify the tax amount.

29.     Jane Doe reiterated their reluctance to offer zero-down financing. Jane Doe then pushed the Plaintiffs into making an additional $2,000.00 cash down payment on top of the $3,995.00 that she'd snuck in.

30.     Jane Doe emphasized that the $300.00 discount was granted due to Goodworth's profession as an Emergency Room Registered Nurse and that she had done all she could to reduce the costs. "Nurses contribute a lot to society," she said, followed by a further conversation about how Nurses are respected and valued. It is disturbing that Goodworth's profession and the resulting public respect were leveraged to manipulate Plaintiffs into this purchase, representing a significant lack of basic ethics.

31.     Dolce asked, "What is the monthly payment?" Jane Doe replied that she was compiling the necessary information for submission and that the finance manager would see the rates and terms offered by the bank. "He sees all the stuff…" Approximately five minutes had elapsed, and John Doe #1 had not yet returned with the sales tax calculation.

32. Jane Doe stated she would submit the financing with "2 down," referring to $2,000.00, and requested Goodworth's initials. Confused, Goodworth said, "Pardon?" Jane Doe then furthered her obfuscation, stating, "It's like, roughly the taxes, it's not going towards anything for the car."

33. Dolce again requested a detailed breakdown of the fees. Jane Doe then attempted to deflect, stating, "He doesn't know exact numbers because he has to submit—he has a system he uses." She then urged the Plaintiffs to submit the down payment for more than $2,000 but stated that $2,000 would be the minimum. Confused and exhausted after approximately three hours at the dealership, the Plaintiffs decided to believe that Certified Luxury Motors was acting in good faith and accordance with applicable laws.

34. Prior to the test drive, Dolce's stepfather observed workers moving the car from the showroom to a nearby gas station. He witnessed them adding air to the tires. Dolce's stepfather then inquired of John Doe #1 in front of Plaintiffs whether the tires, rims, and rotors were safe for his daughter to drive. John Doe #1 replied that they were, stating that tires sometimes deflate while sitting in the showroom and that it was not a significant issue.

35. Goodworth stated his preference for the lower amount down payment, citing the already incurred costs that appeared legitimate but high. However, Goodworth explained to Dolce that he wanted the Defendants to provide a complete, line-by-line breakdown of the fees. He emphasized that he was exhausted and sleep-deprived from working at the hospital the previous night.

36. At approximately 6:30-6:50 PM, Jane Doe instructed the Plaintiffs to test-drive the car off the major road and in the dark residential blocks, where they never exceeded 25 MPH.

Plaintiffs later concluded this was an additional layer of the scheme, as any issues would be imperceptible at slow speeds.

37.    Plaintiffs noticed some issues with the vehicle's sounds and HVAC. When they mentioned the noises and HVAC to Jane Doe, she dismissed them and stated that the HVAC issues were just a matter of learning how to use the buttons.

38.    Around 7:15 PM, Jane Doe directed Plaintiffs into John Doe #2's office to discuss the financing terms he stated he "was given" by Defendant Ally Financial Inc. John Doe #2 then stated the rates would be better if Plaintiffs refinanced the loan through another bank or credit union after receiving the title. He further explained the alleged "open loan concept" and how it functioned.

39.    John Doe #2 continued pontificating for quite some time regarding the "open loan concept".

40.    John Doe #2 then referenced Plaintiffs discussion with Jane Doe about the $2,000.00 down payment for "the taxes," claiming the actual taxes were slightly higher, but that it was acceptable.

41.    John Doe #2 then detailed the loan's "features", including a locked 10.79% interest rate, no prepayment penalty, and a supposed down payment reimbursement. Additional features included a discount on vehicle insurance (up to 10%) and a 36-month/60,000-mile bumper-to-bumper warranty.

42.    Plaintiffs never got a full explanation of how the down payment reimbursement worked, nor vehicle insurance discount.

43.    John Doe #2 stated the monthly payment would be $852.41, to which Dolce exclaimed, "No! Absolutely Not."

44.    Plaintiffs were perplexed by the 10.79% interest rate and high monthly payment, considering Goodworth's 753 credit score, favorable overall profile, and the car's $23,990.00 list price. Dolce again requested a full breakdown of the fees to understand how the monthly payment exceeded $800.00 and the total life of the loan amount reached over $50,000.00. John Doe #2 agreed to provide a fee breakdown.

45.    In addition to the fees already presented by Jane Doe and John Doe #1, he stated there was an additional $1,195.00 loan processing fee, a $1,095.00 destination fee, and $3,874.20 for sales tax, plates, registration, and title.

46.    The imposition of a $1,195.00 loan processing fee is likely not justifiable and was another deceptive act. Charging a $1,095.00 destination fee, in addition to the exorbitant $3,495.00 preparation fee, was clearly excessive and a bad faith effort to increase Defendants profits.

47.    John Doe #2 did not provide an official itemized breakdown or calculation for these fees. He wrote on a piece of paper as he spoke and then showed the piece of paper to the Plaintiffs (see Exhibit A3). He proceeded to inform them that the 3-year/60,000-mile extended warranty would incur an additional charge of $9,495.00 to the loan which Dolce promptly declined.

48.    Plaintiffs were too exhausted to realize the Defendants overcharged them through various unsubstantiated fees, including the $2,000.00 cash down payment and the $3,995.00 down payment intentionally included in the loan to inflate it.

49.    After a brief discussion, John Doe #2 explained that rates and terms are determined by "the lenders we have" and that commercial banks generally do not offer favorable rates, despite Goodworth's stated 753 credit score. He suggested refinancing through a

credit union after signing the loan and further instructed this to be done after making the first loan payment.

50.    John Doe #2 then shared his background as a former military service member presumably to gain Plaintiffs' trust, also mentioning his usage of USAA and Navy Federal.

51.    John Doe #2 asserted that he uses credit unions and that Goodworth, as a Nurse, would qualify for any credit union. He reiterated that refinancing was possible only after Plaintiffs made the first payment and that Goodworth's credit was "Tier A."

52.    To manipulate the Plaintiffs, he leveraged Goodworth's profession, falsely insisting that credit unions would not turn away nurses.

53.    John Doe #2 subsequently posited that banks are essentially permitted to engage in misleading advertising, as it constitutes mere advertisement in regards to "Pre-Approvals" of loans.

54.    John Doe #2's statements caused consternation among the Plaintiffs, who held the understanding that while pre-qualifications were subject to significant variation, pre-approvals offered a more reliable indication of the bank's offer, predicated on credit profile, income, and financing details pending a submitted application.

55.    John Doe #2 stated that Capital One had offered a substantially higher interest rate than the pre-approval. He stated he would show us; He turned the screen and simply clicked a button without revealing what he had filled out prior, thus manipulating the output.  John Doe #2 also didn't clearly explain exactly what Plaintiffs were being shown.

56. John Doe #2 then stated, "We're Ally Financial; gap insurance is free," implying that Ally Financial, which they apparently work with, would cover any loss not covered by standard insurance.

57. John Doe #2 stated that the "LoJack," a vehicle tracking device, was for the Plaintiffs' benefit, claiming it unlocked the 10% auto insurance discount through Ally Financial Inc.

58. John Doe #2 then revealed he resided in New Jersey and would remain until the last client left. By this time, it was nearly 8 PM, five hours after the Plaintiffs' 3 PM arrival.

59. Goodworth thanked John Doe #2 for his dedication. He responded that New York City didn't like cops, but it does favor nurses.

60. Plaintiff Goodworth then signed the paperwork, and John Doe #2 explained he needed to compile a folder, which he described as a "welcome packet," containing all financial information, breakdowns, login instructions, and payment details.

61. Plaintiffs exited his office and attempted to pay the $2,000.00 cash down payment using an American Express Gold card, but John Doe #1 and Jane Doe insisted on a debit card payment, Jane Doe stating it was "better that way, less fees".

62. Plaintiffs did a "ring the bell" video as a congratulatory measure, taken by Jane Doe. She then instructed them to bring the car back on Monday for a complete wheel alignment, to which Dolce agreed.

63. Plaintiffs drove home unsuspecting of any issues with the car or the loan.

January 27, 2025

64. On Monday, January 27, 2025, Plaintiff Dolce returned to the dealership for the requested car alignment. She noted the car's start locator light animation and auto mirrors

were not functioning and requested they be checked. Dolce also discovered the front and rear heating consoles were non-operational and asked for their repair.

65.    Jane Doe affirmed after approximately 40 minutes that the repairs were done. Dolce exited the dealership and meanwhile texted Jane Doe, "Send me the review link if you need one...5/5" (see Exhibit A4) Dolce was unaware of any further issues.

**February 1, 2025**

66.    On Saturday, February 1st, at approximately 12:30 PM, the Plaintiffs discovered a tire pressure warning, a low wiper fluid warning, and unusual noises from the wheels and brakes. The air conditioning system also still appeared to be malfunctioning. They attempted to contact the "Headstart Warranty Group," their supposed dealership warranty provider (see Exhibit A5). Headstart's "repair pal" service directed them to an Auto Body and Repair shop in Long Island City.

67.    Upon arrival and inspection, a mechanic named "Slatch" identified preliminary issues and instructed the Plaintiffs to contact the warranty company, as a comprehensive inspection would take several days and require prior approval for a rental vehicle.

68.    Plaintiffs contacted Headstart Warranty Group, who reported they could not locate any information for the vehicle or the registered owner, "Darius Goodworth."

69.    Believing the warranty might still be processing, Plaintiff Dolce texted Jane Doe at her provided phone number, inquiring whether to use the company listed in the welcome packet they provided or return to the dealership. Jane Doe replied, "Bring it in"(see Exhibit A6).

70.   Plaintiff Dolce received a text message soon after from an unidentified number requesting that she bring her vehicle to Certified Luxury Motors at noon on Monday. The sender of this message remains unknown to the Plaintiffs (see Exhibit A7).

February 3, 2025

71.   On February 3rd, the Plaintiffs returned to the dealership for the previously mentioned repairs. John Doe #1 initially addressed the HVAC system issue, stating he would reset the system. He then inquired about the rear right tire pressure warning, suggesting a possible leak. Then, he said he would replace it with a new tire at no cost that same day.

72.   Dolce then inquired about "Headstart Warranty Group", included in the welcome packet provided by John Doe #2. John Doe #1 responded that the warranty did not begin until the loan was funded, typically 30 days from the purchase date. Until that time, required repairs should be brought directly to the dealership.

73.   Plaintiffs waited to be told that the repairs were completed, then left with John Doe #1's affirmations that the issues were fixed as promised.

February 4, 2025

74.   On February 4th, Dolce texted Jane Doe, expressing concerns about the vehicle's compromised fuel efficiency and its viability for use in New York City, given the high fuel costs (see Exhibit A8). Jane Doe attributed this to the vehicle being an "AMG," suggesting it was a gas-guzzler due to its high-performance nature.

75.   Dolce then inquired about a potential trade-in for the initially desired A-220, which offered better mileage and lower overall costs. Jane Doe agreed to investigate the trade-in possibility and provide a response but failed to follow up.

February 18, 2025

76.    On February 18th, Plaintiff Dolce observed a tire pressure warning, this time on the front left tire. Her cousin was present while she added air to the tire at a gas station. Lacking quarters, the Plaintiff purchased a chocolate bar at the gas station to obtain change (see Exhibit A9). Dolce's cousin expressed concern, emphasizing the car's recent purchase.

77.    After dropping her cousin off in Midtown Manhattan, she drove uptown towards The Mount Sinai Hospital, where Goodworth was working an Emergency Room shift from 2 PM on February 17th to 2 AM on February 18th.

78.    Around 11:13 PM, while driving on Park Avenue between 30th and 34th Streets, another tire pressure warning appeared for the same tire. Alarmed, as she had just added air in Brooklyn over an hour prior, Dolce stopped the car to take a picture at a green light on the nearly empty road (see Exhibit A10).

79.    Upon arriving in Upper Manhattan, she stopped at another gas station to refill the tire. At 11:58 PM, she attempted to call her cousin to ask for advice (remembering her previous concerns earlier in the night). However, the call went straight to voicemail presumably because her cousin was at work.

80.    At approximately 2:00-2:15 AM, Darius Goodworth and his colleague Donovan arrived at the car. Dolce unlocked the vehicle and admitted them, whereupon Darius informed her that Donovan would be joining them for a carpool to Brooklyn.

81.    During the journey, she articulated her apprehensions regarding the vehicle to Darius and Donovan. After approximately ten minutes of travel on the FDR South, the vehicle's ride became markedly "bumpy."

82.    Around 2:30 AM, while passing the East Village on the FDR South, Plaintiffs heard a loud explosive noise from outside the vehicle, and Dolce yelped. She lost control of the wheel, and the car began to swerve into the left guardrail towards the East River. Lunging to pull the wheel towards the center, which proved difficult, she attempted to brake slowly to avoid further loss of control.

83.    A noxious smell emanated from the tire, and she was able to direct the car to roll towards the nearest exit. She struggled to maintain power for several minutes as surrounding cars swerved around her vehicle, emitting screeching noises. According to the car's digital monitor, the car's tire was at zero pressure and a high temperature. They managed to pull off Exit 4 and park at Grand Street and FDR Drive South.

84.    Plaintiffs had attempted to use the tire repair system located in the trunk, but it was ineffective. The tire was flat and the dealer had not provided a spare with the vehicle.

85.    Plaintiff Goodworth called their car insurance company to have the vehicle towed (see Exhibit A11), as Dolce anticipated Jane Doe would not review her text message detailing the situation until later in the day (see Exhibit A12). The tow truck arrived around 3:42 AM (see Exhibit A13).

86.    Plaintiffs arrived at Goodworth's parking garage at approximately 4:35 AM in the tow truck. Plaintiffs asked the garage attendant to leave the vehicle in front, as they intended to have the dealer tow it for repairs in the morning.

87.    Plaintiffs called Jane Doe at 10:35 AM. She confirmed she had seen the 3 AM text message and expressed remorse for the situation. Jane Doe stated she would arrange for the car to be towed to the dealership and then to their affiliated mechanic shop (North Side Car Care).

88. Jane Doe requested that Dolce text her the garage address and information to retrieve the car from the garage attendants (see Exhibit A14). Jane Doe then affirmed these texts and Plaintiffs were under the illusion a remediation plan was in place.

89. At 11:41 AM, the Plaintiffs received a call from Jane Doe, with John Doe #3 also on the line. Jane Doe stated that her manager had denied any liability for the incident and refused to honor the previously affirmed tow and repairs. A discussion ensued, during which Dolce emphasized that they had owned the car for less than 30 days and had experienced numerous issues, including a severe safety failure on a prominent New York City highway that endangered three passengers and other motorists.

90. John Doe #3 stated that their warranty does not cover tires, attributing the issue to wear and tear. Dolce countered, arguing that the problem could not be wear and tear, given the multiple issues since the recent purchase, including a faulty rear right tire (the Defendants claim they replaced).

91. John Doe #3 then asserted that Dolce's lack of vehicle operational knowledge was not his fault. He offered a "demonstration"—a callous and patronizing attempt to shift blame and mask the dealership's failure to provide adequate service.

92. John Doe #3 concluded by stating that he did not wish to argue and that the decision was final.

93. Plaintiffs urged Jane Doe to have her managers reconsider, citing potential legal action. They also requested proof of the rear tire replacement as Goodworth had an unsettling suspicion the mechanic shop merely rotated the defective tire to the front left. Jane Doe affirmed that they had documentation for the tire and she would forward it to Plaintiffs. Plaintiffs never received a copy of this proof.

94.     Following the call, the Plaintiffs sent a demand letter (see Exhibit A15) to Defendant Certified Luxury Motors via the listed email on their official business card requesting relief concerning the vehicle's tires, proof of the purported 125-point inspection, and verification of the rear right tire's replacement.

95.     Plaintiff Dolce then went to a tire factory in Southern Brooklyn and purchased an 18-inch tire, as Jane Doe had stated on the day of purchase that these were the proper sizes for the car. The online advertisement for the vehicle also affirmed this statement (see Exhibit A16, 2/3).

96.     Plaintiff Dolce then proceeded to a tire repair and installation shop in Flatbush, Brooklyn, where Mechanic #1 informed her that the tire size was incorrect. The car actually had 19-inch wheels, so Mechanic #1 had to provide a new tire in order to do the replacement.

97.     Subsequently, Mechanic #1 inspected the rim of the original tire and found it severely damaged, exhibiting cracks, bends, and warping (see Exhibit A17). He warned the Plaintiff that this damage indicated years of wear and tear and prior repairs.

98.     Mechanic #1 stated that the rim could not have passed inspection and recommended checking all tires for safety. He then stated, "I'm surprised you didn't crash sooner—this is criminal."

99.     Mechanic #1 then advised that the Plaintiffs take the car to a qualified full-service mechanic as soon as possible for a full assessment, as he specialized only in tire replacement and repair.

February 19, 2025

100.    On February 19th at 12:13 PM, Dolce called Headstart Warranty Group, suspecting a complex scheme by Defendant Certified Luxury Motors and its employees. An employee for them confirmed her suspicion that no such warranty was pending or existing with the company. Statements which contradict prior assertions and documentation provided by Defendant Certified Luxury Motors' employees.

101.    At 3:42 PM, while driving to a barber appointment in the Upper East side, the Plaintiffs spoke with an employee from Mercedes-Benz Manhattan (see Exhibit A18), who confirmed that the vehicle's ongoing issues were inconsistent with a car "reconditioned to manufacturer standards," as claimed by Certified Luxury Motors in person and on their website.

102.    The Mercedes Benz employee also stated that a car with such problems couldn't have passed a 125-point inspection. He set an appointment for the Plaintiffs to bring the vehicle to Mercedes Benz for a manufacturer evaluation in March (their closest appointment date).

103.    At 6:55 PM, Plaintiff Dolce called Certified Luxury Motors from her residence in Manhattan and spoke with an unknown female employee.

104.    Dolce requested from this employee the full names of all employees involved. Plaintiff provided all four first names she was aware of including: Tatianna (currently Jane Doe), Daniel aka Danny (currently John Doe #1), Richard (currently John Doe #2), Vince (currently John Doe #3).

105.    The unknown female employee ultimately denied this request. Plaintiffs requested to be transferred to John Doe #2 (Finance Manager) for copies of all loan documents, a

breakdown of fees, and related financing documentation. The unknown female employee

obliged to the transfer, but the call immediately disconnected.

106.     Goodworth instructed Dolce to refrain from calling back, suspecting they were

attempting to hide information. He advised her to go to the Defendants in person to

ensure that the records were not altered or destroyed.

February 20, 2025 - Goodworth's Residence

107.     On February 20, 2025, at 9:26 AM, Plaintiff Dolce called Ally Financial Inc. to

report suspected fraud, requesting an investigation and a possible freeze on loan

payments pending evaluation of Plaintiff's evidence and their own findings.

108.     Ally Financial Inc. declined to conduct an investigation and instructed Plaintiffs to

pursue all matters with the dealership.

109.     Ally Financial Inc. stated that they're just a third party to the transaction and they

don't deal with vehicle issues. This was the reasoning as to why the loan could not be

investigated, frozen, or cancelled.

110.     At 10:37 AM, Plaintiffs called Car Doc Automotive, a full-service mechanic

recommended by Goodworth's barber. Dolce informed them of the car's problems and

was instructed to stop by that week to explain further.

February 20, 2025 - Certified Luxury Motors

111.     At approximately 5 PM, Plaintiffs returned to Certified Luxury Motors at 215

Northern Blvd. Plaintiff Dolce proceeded towards the front reception desk where Jane

Doe and John Doe #1 were conversing.

112.    Jane Doe acknowledged receipt of the demand letter sent via email on the 18th, stating she had directed John Doe #3 to review it. She explained that John Doe #3 had instructed the Plaintiffs to "send everything in the email."

113.    Plaintiff Dolce reminded Jane Doe that the email is to the owner, not John Doe #3.

114.    Jane Doe affirmed that John Doe #3 would respond presumably on the owner's behalf. Dolce reiterated that everything was in the email. No response was ever received from John Doe #3 or the owner, Fawad Awan.

115.    Plaintiff then requested financial and service records related to the car, including a full breakdown of fees, the complete loan application, and banking information. Jane Doe acknowledged the request, stating that John Doe #2 (Finance Manager) could provide the documents and instructed her to wait until he completed another loan transaction.

116.    Seconds later, Jane Doe called Dolce back to the front desk. John Doe #1 asked if the Plaintiffs had replaced the tire. Upon confirmation, Jane Doe stated John Doe #1 was going to reimburse the front left tire replacement costs. John Doe #1 affirmed this statement twice. Jane Doe then deflected responsibility by stating "Vince" John Doe #3 was the one Dolce was speaking to on 2/18/25. Ultimately implying that John Doe #3 and John Doe #1 can make different calls regarding company policy.

117.    John Doe #1 then apologized on behalf of John Doe #3, and Jane Doe asserted that Dolce was very upset that day.

118.    John Doe #1 attempted to theorize "potholes" as the cause of the accident, which the Plaintiff immediately rejected.

119.    Plaintiff informed them that a mechanic had inspected the rim and reported substantial wear and tear that appeared to be pre-existing.

120. Dolce then informed John Doe #1 and Jane Doe of Mechanic #1's findings which John Doe #1 responded, "I get it." Dolce then reiterated that she wanted the finance information and was instructed to sit in the waiting area for John Doe #2.

121. Fifteen minutes later, John Doe #2 escorted Plaintiff Dolce to his office, stating he was busy and that sales should provide the requested information. Dolce countered, saying that Jane Doe and John Doe #1 at the front desk had directed her to him.

122. John Doe #2 proclaimed his honest nature several times, even implying his other co-workers were not honest. He then signaled for an unidentified employee to come to the door.

123. John Doe #2 asked the unidentified employee, "This young lady, she wants the breakdown? She's under the impression she's getting it from me. You want to help her get the breakdown?" This request was suspicious to Plaintiff, as John Doe #2 initially handled the financing paperwork and held the title of "Finance Manager."

124. John Doe #2 reaffirmed his honesty. Dolce questioned, "But wouldn't that come from you, because you're the Finance Manager?" He denied this statement and passed it off on the sales manager (John Doe #1). John Doe #2 then contradicts his previous statement concluding that when he finishes the paperwork it goes to the bank. He then expressed that everyone at Certified Luxury Motors is aware of this process.

125. John Doe #2 begins to lead Dolce out of his office. Dolce then asked for John Doe #2's first name; he said Richard and then followed with, that he's the guy "who tells the truth."

126. Dolce states, "I was like, if there was a breakdown of fees? Wouldn't he have given them to me?" John Doe #2 declined this thought. He went on to reiterate that once he finished the paperwork, it left his office, and the loan went straight to the bank.

127. John Doe #2 attempted to deflect responsibility by stating his colleagues should have been familiar with the procedure, and he did not understand why they held him accountable. John Doe #2 then directed Dolce to a seat and returned to the front desk to confer with John Doe #1.

128. Approximately ten minutes later, John Doe #2 returned and escorted Plaintiff Dolce back to his office.

129. John Doe #1 asked about Dolce's return, speculating it was due to the car's tire. He then shifted blame to the Sales Department before offering to discuss finance, contradicting his earlier claim of having no paperwork.

130. Plaintiff Dolce then reiterated the documents she required, which had not been provided at the time of sale. John Doe #2 again tried to pass blame on to the Sales Department. According to him, it was the Sales Department's responsibility to provide "Customer Copies" of documentation before the vehicles left the lot. He then mentioned a welcome packet from Ally Financial Inc., which he claimed would contain the requested information.

131. Dolce pointed out that the plaintiffs had not received the paperwork packet, questioning why it was delayed given the 26 days since the sale. John Doe #2 responded by deferring to his colleagues for an explanation, while simultaneously asserting the process was transparent. He further stated that Darius was the intended recipient of the

financial information, but they were making an exception for Dolce because of their knowledge of their romantic partnership.

132.    John Doe #2 acknowledged the information's confidential nature, belonging to Goodworth, yet consented to sharing it, citing its relevance to Dolce due to their romantic connection.

133.    John Doe #2 then proceeded to explain that all documentation, originating from Ally Bank, was intended for delivery to Goodworth's residence.

134.    John Doe #2 suggested Dolce could expedite the process by contacting Ally Bank directly and providing Goodworth's social security number.

135.    John Doe #2 also detailed the login procedure, indicating it would involve Goodworth's social security number and a self-created password.

136.    John Doe #2 then offered to provide a finance breakdown.

137.    Dolce relayed that Plaintiff Goodworth requested a printed fee breakdown. John Doe #2 stated the information would come from the lender, Ally Financial Inc. Dolce inquired whether Ally would have details on the fees included in the loan. John Doe #2 responded that he could show her the breakdown, as it was readily available on his desk.

138.    John Doe #2 produced the previous handwritten piece of paper with numbers (see Exhibit A3). Still, it lacked any detailed breakdown, titles of fees, explanations of what the fees were, interest rate (determination methodology), credit score used to determine the rate, or any information typically included in financing paperwork.

139.    John Doe #2 claimed that customer requests for financing breakdowns were common, and he typically provided handwritten calculations due to the information's format, which he described as unlike standard bank financing documents. This contradicted the

Plaintiffs' prior experience, where loan signings consistently involved detailed, typed, and letter headed financing documentation, readily available upon request.

140.  John Doe #2 stated that he consistently used the handwritten method.

141.  Dolce asked if John Doe #2 had any additional financial paperwork, to which he replied negatively. Dolce then stated she would photograph the documents to share with Goodworth, who expected more paperwork. John Doe #2 confirmed that no further documents existed.

142.  John Doe #2 reiterated that his financing paperwork process was due to the lack of formal financing documentation from Ally Financial Inc. (see Exhibits, A3 & A19)

143.  Dolce questioned the $31,180.00 price, clarifying that it included all dealer fees, while the list price was $23,000. John Doe #2 confirmed the price discrepancy was accurate and common. He stated that clients frequently acknowledged the lower online listing price but then forgot how the financed price became significantly higher.

144.  John Doe #2 indicated that it was standard practice for Certified Luxury Motors to remind customers of the Sales Department conversations, implicitly referencing discussions with Jane Doe. He then clarified that the finance department's initial offer was based on a starting selling price of $31,180.00, which preceded processing fees, taxes, and DMV charges.

145.  John Doe #2 continued his attempt to separate the two departments at Certified Luxury Motors. He proceeded to itemize a series of charges, including the vehicle's selling price, loan acquisition costs, loan processing fees, bank fees, destination charges, taxes, and tag fees. He also referenced a $2,000.00 deduction for a cash down payment,

which he stated resulted in a final financed amount of $34,344.20 over a six-year loan term.

146.    Dolce stated the car's warranty was a standard 3-month warranty from Headstart Warranty Group, which John Doe #2 confirmed. However, when Dolce asked about the warranty's activation, John Doe #2 contradicted himself, asserting that the actual warranty was the New York State Lemon Law Warranty, not the Headstart Warranty Group.

147.    Dolce expressed confusion, noting the advertised comprehensive 3-month warranty on their website and the provided Headstart Warranty Group packet. John Doe #2 reiterated that the warranty was the New York State Lemon Law warranty.

148.    It is important to note that the New York State Lemon Law is a statute, not a written warranty. Dealers are still required to provide an actual written warranty for new and used vehicles meeting certain mileage thresholds, which the Plaintiffs' vehicle did meet.

149.    Plaintiff requested John Doe #2 to explain the rationale for the 10% interest rate on the car loan, given Goodworth's excellent credit rating across bureaus, with a 753 score at the time of the hard inquiry.

150.    John Doe #2 responded that it was based on the year of the vehicle. This was a gross misrepresentation, as Dolce had since learned that a more complex set of factors determines interest rates.

151.    John Doe #2, in what appeared to be a faithful recitation, once more expounded upon the "Open Loan Concept."

152.    John Doe #2 explained that their consistent opening statement to clients emphasized the absence of any prepayment penalty. This was intended to assure clients that they

retained the right to pursue financing options that aligned with their desired interest rates. He clarified that an open loan allowed for refinancing at any time. He advised clients that after receiving their initial statement and making their first payment, they were free to refinance with their preferred bank or lender if they believed they could secure a more favorable interest rate, such as 2%, 3%, or 4%. He acknowledged that the banks he worked with offered specific rates, and he encouraged clients to seek better options elsewhere if they felt they were available.

153.    Plaintiffs understood John Doe #2's statements regarding the lack of a prepayment penalty and the option to refinance as justification for the interest rate. Plaintiffs also understood the statement, "Refinance at your own bank and lenders," to mean it was the Plaintiffs responsibility to obtain a lower rate.

154.    Plaintiffs found John Doe #2's statement to be inconsistent with standard dealership lending practices.

155.    Plaintiffs understood John Doe #2's statement, "Refinance at your own bank and lenders," to mean that the dealership did not intend to provide them with the most favorable loan terms. Plaintiffs felt that the statement minimized the potential difficulties and costs associated with refinancing.

156.    Dolce persisted in her questioning, stating that Jane Doe had previously informed them of an automatic, comprehensive 3-month warranty. John Doe #2 responded by explaining that the State of New York provides a mandatory warranty ranging from 30 to 90 days, depending on the vehicle's mileage. He then asserted his honesty and clarified that while he was not involved in sales, he could confirm the contents of theconversation, and that this was the extent of his ability to assist.

157. Plaintiff Dolce requested a printed copy of the contract. John Doe #2 stated it could be emailed. John Doe #2 then stated that Goodworth would need to email express consent for Dolce to receive a copy. Plaintiff Dolce had previously been shown multiple documents containing information without Goodworth's authorization.

158. Dolce requested John Doe #2's business card and confirmation of the email address the demand letter had been sent to. He confirmed that "Certifiedluxurymotors@gmail.com" was the correct email and that Goodworth can even be cc'd on communications, and they'll provide it to her. Proving that the demand letter dated 2/18/25, which included Plaintiff Goodworth as a cc'd recipient, should have been sufficient for the release of information.

159. Dolce continued towards the front desk with John Doe #2, he presented the same business card previously given (see Exhibits A20 & A5 3/3). She then inquired about the warranty again, at which point he concluded the conversation by stating that the Sales Manager, John Doe #1, would provide further explanation, and she could have a seat and wait for him.

160. After several minutes, John Doe #1, whose name was now known as Daniel, approached and asked how he could assist. Dolce requested the official procedures and documentation for the Headstart Warranty Group's purported 3-month warranty. John Doe #1 then changed his previous position, which stated the written warranty would begin after 30 days. He stated, It's the Lemon Law—which according to him said if you take it to your mechanic, they check it out, and supposedly whatever had to be done Certified Luxury Motors would manage.

161.    Dolce referenced Jane Doe's promise of an inspection report copy. John Doe #1 agreed to provide it. Dolce then asked for proof of the back right tire replacement, leading John Doe #1 to ask, confusedly, if she had already changed it. Dolce responded, surprised, that she believed Certified Luxury Motors had replaced the tire on February 3, 2025. John Doe #1 verbally confirmed the replacement and then walked away to search through a file.

162.    Proof of replacement was necessary for Plaintiffs because they observed that the tire on the front of the vehicle appeared to be the same tire that had previously been on the back right. Plaintiffs were informed on 2/3/25 by John Doe #1 that the tire was faulty and he ensured he'd fix it.

163.    When called to the front desk, Dolce was handed a New York State Vehicle Inspection Report (not a 125 point inspection) by John Doe #1. This single-page document outlined only the vehicle's passing or failing grade (see Exhibit A21). Plaintiff Dolce noted that this document did not contain the detailed analysis of the vehicle's condition that she had been told would be provided.

164.    The New York State Vehicle Inspection Report indicated a passing grade. The report included the statement, "Wheel Removed: L/F, R/F, L/R, R/R." Plaintiffs had prior conversations with other mechanics and Mercedes-Benz representatives who provided information about inspection standards. Plaintiffs noted a discrepancy between the report's passing grade and the observed condition of the vehicle.

165.    John Doe #1 stated he would provide proof of the tire replacement, explaining that the shop was closed and they held the files. Dolce understood John Doe #1 to be referring

to the mechanic shop listed on the NYS Vehicle Inspection Report, as he gestured towards their name on the document.

166.    Plaintiff read the Vehicle Inspection Report disclosure, which stated: "Any recall information included in this report is based on information supplied to the New York Vehicle Inspection Program at the time of inspection. The program depends on its sources for the accuracy and reliability of its information. Therefore, no responsibility is assumed by NY DMV or its agents for errors or omissions in this report." Plaintiff planned to visit the mechanic shop on Monday.

February 21, 2025 - Early Morning (Upper Manhattan)

167.    At 1:30 AM on Friday, February 21, 2025, Plaintiff Dolce proceeded to The Mount Sinai Hospital to retrieve Goodworth upon completion of his emergency room shift.

168.    Plaintiff observed a tire pressure warning around 2:00 AM while driving on the FDR North.

169.    At 2:21 AM, Plaintiff purchased items at an Upper East Side gas station to get quarters for a tire air machine (see Exhibit A22). She subsequently filled the tire up and proceeded towards the hospital.

February 21, 2025 - Downtown Brooklyn USPS

170.    At approximately 3:00 PM, Plaintiff Dolce entered a USPS Office located at 539 Atlantic Ave, Brooklyn, NY.

171.    Dolce sent a certified letter to Defendant Certified Luxury Motors containing the same information as the prior demand letter email.

172.    Plaintiff then mailed a signature-request letter to the Defendant Ally Financial Inc.

headquarters, requesting a pause on the loan pending an investigation into the Defendant

Certified Luxury Motors' potentially fraudulent practices (see Exhibit A23).

February 21, 2025 - Recommended Mechanic First Visit

173.    At approximately 4:00 PM, Plaintiff Dolce visited the mechanic recommended by

Goodworth's Barber in Brooklyn, NY. Dolce explained the vehicle's known problems.

"Mechanic #2" informed her that a full analysis was not possible that day due to the late

hour and scheduled an appointment for the following week. Before Dolce departed,

Mechanic #2 requested a detailed account of the events leading to the vehicle's current

condition.

174.    Mechanic #2, in what appeared to be a significant coincidence, described a personal

experience of being deceived by Certified Luxury Motors. He recognized the dealership

as the one located on Long Island, recalling purchasing a vehicle there. He stated that he

had been assured the car was in pristine condition, with no prior accidents or issues. At

the time, he believed he had secured a favorable purchase. However, upon inspecting the

vehicle on his lift, he discovered numerous discrepancies, citing approximately thirty

different problems within a brief ten-minute examination.

175.    Mechanic #2's findings concluded that their vehicle was, in fact, involved in an

accident, citing evidence suggesting a doctored inspection, falsified Carfax report, and

clear misrepresentations by Certified Luxury Motors and its employees. They also noted

that what initially seemed like a good deal was, upon closer inspection, predatory.

Plaintiff recounted that Certified Luxury Motors represented her vehicle as

"accident-free," to which Mechanic #2 responded, "All bullshit."

176.   Mechanic #2 affirmed that his boss would prepare a comprehensive report detailing the vehicle's condition but stated it would have to be completed the following week due to scheduling constraints. They then inquired about the individuals Plaintiff dealt with at Certified Luxury Motors. Mechanic #2 mentioned "Uri," whom Plaintiff Dolce believed she recognized, but couldn't confirm because she primarily interacted with managers "Daniel" (whom Mechanic #2 immediately referred to as "Danny"), "Vince," and Finance Manager "Richard." Mechanic #2 confirmed that John Doe #2 (Richard) did the financing on his loan as well.

177.   Plaintiff then inquired about the specifics of Mechanic #2's disposal of the vehicle. They recounted that upon discovering an undisclosed accident history on the vehicle purchased from Certified Luxury Motors, they personally repaired all defects and subsequently sold it.

February 21, 2025 - Ally Financial Inc.

178.   Plaintiff Dolce went to Mount Sinai Hospital in Upper Manhattan at approximately 7:00 PM to have lunch with her partner, Plaintiff Goodworth. She requested permission to contact Defendant Ally Financial Inc. out of a suspicion that Ally was possibly complicit in Defendant Certified Luxury Motors' actions.

179.   Plaintiff Goodworth gave Dolce verbal permission to speak with Ally Financial Inc. regarding his finance paperwork and standing.

180.   At 7:52 PM, Plaintiff Dolce received a call from Jane Doe, who stated that there was a VIN discrepancy or an issue with their undisclosed insurance. Both Plaintiffs were present for the call and deemed it highly suspicious, considering the preceding events of

the week. Goodworth instructed Dolce to disconnect the call and immediately contact Ally Financial Inc. to gather further information.

181.    Plaintiff Dolce called Defendant Ally Financial Inc. from outside The Mount Sinai Hospital at 8:33 PM. She expressed concern about Plaintiffs not receiving full loan information and payment instructions at the time of the vehicle purchase.

182.    Plaintiff requested a copy of the submitted loan application, welcome packet, and all documents related to the loan. Defendant Ally Financial Inc. stated that they could not email the documents and could only send them via mail or fax.

183.    Ally Financial Inc. initially claimed the welcome packet was sent via SMS "Short Message Service", but Plaintiff was unfamiliar with this method.

184.    Ally Financial Inc. admitted that they "purchase the loan contract" from the dealer and do not handle the loan application or approval, loan terms, or interest rate calculations. They directed Plaintiffs to contact Defendant, Certified Luxury Motors for this information.

185.    Ally Financial Inc. admitted they did not have the loan application or lien information, as it hadn't been sent by Certified Luxury Motors. Ally Financial Inc. affirmed they only had a six page contract. Dolce was confused because their copy from the date of purchase was a 4 page contract (see Exhibit A24).

186.    Plaintiff furnished Ally Financial Inc. a fax number to receive any documents they held concerning Goodworth.

187.    Plaintiff requested to speak with a higher department, expressing confusion about how a bank could fund a loan without underwriting or approving it. They refused to

transfer the Plaintiff to the "Loan Funding Department," stating they don't accept phone calls.

188.    Ally Financial Inc. maintained that they were not Plaintiffs' application partner and that essentially underwriting, approving, and providing a copy of the loan application was "not their process".

189.    Ally Financial Inc. repeatedly refused to provide the requested documents, citing procedural limitations and not having a majority of the documents from Defendant, Certified Luxury Motors.

190.    Ally Financial Inc. stated they had sent a bill for the loan through mail and via their website platform on 2/20/25 (see Exhibit A25). This statement was made concurrently with an admission that they didn't have a copy of the actual contract yet.

191.    Plaintiff objected to the demand for payment on a loan for which Ally Financial Inc. could not provide documentation, citing potential violations of state and federal law. In response, Ally Financial Inc. stated, "Because it's not our process," before the Plaintiff requested to speak with a manager for further clarification.

192.    Ally Financial Inc. repeatedly stated that Certified Luxury Motors acted as the initial lender and that Ally Financial Inc. merely serviced the loan after purchasing the contract.

193.    The precise amount of the contract payment from Ally Financial Inc. to Certified Luxury Motors remains unknown at this time.

194.    During the call with Ally Financial Inc., Plaintiff Dolce received a call from Goodworth at 8:55 PM. During this call, Plaintiffs agreed that they did not enter the loan agreement with the understanding that Certified Luxury Motors was the actual lender or financier responsible for underwriting and setting loan terms.

195. Plaintiffs believed Certified Luxury Motors was acting as an intermediary, gathering information to submit applications to multiple banks and then presenting the best available interest rates and term offers.

196. Plaintiff Dolce ends the call with Goodworth abruptly to go back to the other line with Ally Financial Inc.

197. Ally Financial Inc. transferred the call to an "Escalations Manager," who reiterated that the loan application, terms, and approval were the responsibility of the Defendant, Certified Luxury Motors. The Escalations Manager confirmed that Ally purchased the loan contract from the dealer. He then cited internal policies regarding not sending financial document disclosures to customers.

198. Dolce informed Ally Financial Inc. that financial disclosure and transparency is required by multiple federal and state laws and that their internal policy was irrelevant. His response was, "If it's the law? then you can check with the law, ma'am, but we don't do that." Dolce then affirmed she would and disconnected the call.

199. Dolce did not receive the requested loan documents during the call. Ally Financial Inc. maintained their position that Plaintiffs must obtain the information from Defendant, Certified Luxury Motors. Inquiries regarding underwriting also fell within this scope.

February 23, 2025

200. At 1:30 PM, Plaintiff Dolce contacted North Side Car Care seeking the service records for her vehicle. An attendant answered, and after some communication difficulties, Plaintiff understood his name to be "Mahesh." Mahesh informed Plaintiff that the owner's authorization was required to release the requested records and that the owner would be available shortly. He advised Plaintiff to call back.

201.    At 2:48 PM, Plaintiff Dolce's call was once more answered by Mahesh, who

informed her that the owner was unavailable.

February 24, 2025 - Initial Inspection Mechanic

202.    On Monday, February 24, 2025, at approximately noon, Plaintiff Dolce visited

Defendant North Side Car Care, facility number 7098670. She sought service and

inspection records to investigate how the vehicle, later sold to her and Goodworth, passed

inspection.

203.    Dolce provided (who'll be referred to as Mechanic #3) the vehicle's VIN. He

requested the last six digits and proceeded to look up the vehicle. There was another

mechanic present in the room, who will be referred to as Mechanic #4.

204.    Mechanic #3 stated, the only record he had for the car was the emissions inspection,

referring to Exhibit A21,  a single-page document with minimal information provided by

the dealer the previous Thursday.

205.    Dolce then asked for confirmation of whether the back right tire change was

performed at their shop. Mechanic #3 denied this.

206.    Dolce then inquired about the inspection signatory, specifically which mechanic.

Mechanic #3 did not answer this directly and stated, "Well, we did it here." He then asked

"Why do you have a problem with the car?" Dolce replied affirmatively and proceeded to

explain the relevant preceding events. After listening, Mechanic #3 responded by saying

"Wow" and reiterating that Exhibit A21 was all the information he had on the car.

207.    Dolce then inquired about the purported 125-point inspection, which she assumed

was conducted concurrently. Mechanic #3 responded saying he wasn't sure about that,

and asked who Plaintiff spoke to at Certified Luxury Motors. Dolce identified employees

"Daniel" (John Doe #1) and "Tatianna" (Jane Doe), who had both referenced the supposed report.

208.    Mechanic #3 then redirected, asking "What's going on with the car and what happened to it? You had a puncture on the tire?" Dolce refuted that theory and proceeded to expand upon the vehicle's issues and the preceding events.

209.    Mechanic #3 attempted to attribute the tire issues to road conditions and a possible puncture while driving.

210.    Dolce countered by explaining the tire shop's assessment of the rims' condition, stating that the damage and prior repairs indicated their existence prior to purchase and inspection. She then exclaimed, "He didn't even understand how it passed inspection."

211.    Mechanic #4 responded, "Wow." Mechanic #3 tried to blame the rim damage directly on the tire blowout incident. Mechanic #4 concurred. Dolce continued, by saying Certified Luxury Motors is attempting to implicate them in the 125 point inspection debacle to which Mechanic #4 denied by saying, "Nope."

212.    Mechanic #3 confirmed that he was currently experiencing issues with Certified Luxury Motors and its staff.

213.    Mechanic #4 denied that North Side Car Care corporation performed work on the air conditioning or tires. Mechanic #3 then interjected, suggesting that Mercedes-Benz rims were inherently fragile, seemingly attempting to deflect responsibility onto the manufacturer's quality standards. However, he abruptly retracted this assertion, stating he was not making that claim.

214.    Mechanic #3 and Mechanic #4 reiterated that they did not conduct a 125-point inspection or change the back right tire. Disclaiming any involvement or ability to assist with it.

215.    Mechanic #3 then admitted he didn't have any other listing or information for the car. He stated he barely even touched the vehicle or did anything to it.

216.    Plaintiff Dolce then walked out of the mechanic shop and proceeded towards Certified Luxury Motors.

February 24, 2025 - Dealership

217.    Dolce arrived at Certified Luxury Motors, located at 215 Northern Blvd, Great Neck, NY 11021. Upon reaching the front desk, where John Doe #1 was assisting another customer, she again requested the 125-point inspection report.

218.    John Doe #1 stated he had provided Dolce with the inspection report, referencing Exhibit A21. Dolce immediately corrected him, stating he had given her a safety emissions report. John Doe #1 confirmed, and Dolce reiterated her request for the 125-point inspection, as previously promised.

219.    John Doe #1 altered his prior statement, asserting the provided document was the requested inspection. Dolce disputed this, stating it was not a 125-point inspection. John Doe #1 requested additional time. Dolce then requested documentation proving the back right tire replacement, such as a work order or serial number. John Doe #1 indicated he would provide such documentation. Dolce then waited.

220.    After several minutes, John Doe #2 approached the front desk to speak with John Doe #1. John Doe #2, en route to go outside, asked the Plaintiff, "How are you?" She replied,

"Not good. " To which he responded, "I'm sure they'll take care of you," and quickly

exited to join Jane Doe on the outside steps.

221.    Dolce waited for approximately fifteen minutes, during which John Doe #1 remained

engaged in a phone conversation. Dolce then returned to the front desk and informed

John Doe #1 that she had limited time. John Doe #1 requested to send the documentation

via email. Dolce declined. Dolce had previously provided her email address to the

Defendants on February 18, 2025, and they had confirmed receipt.

222.    Dolce inquired whether the documentation was immediately available in the file.

John Doe #1 responded negatively. Dolce then asked where the documentation was

located. John Doe #1 stated it needed to be generated. Dolce further inquired as to who

performed the work. John Doe #1 replied, "Service."

223.    Dolce pressed for clarification, asking specifically who performed the work. John

Doe #1 then stated, "The Service Department" Dolce, expressing confusion, asked if he

was referring to the Service Department at that location. This statement contradicted prior

representations that the inspection and repairs were performed by the mechanic shop

listed on the inspection report.

224.    John Doe #1 requested Dolce's email address to generate the documentation. Dolce

responded by providing her email address and stating that the document should have been

readily available. John Doe #1 confirmed he would send it. Dolce then asked if he

possessed the document. He replied that he needed to retrieve it, as it was not physically

present, due to the service department's separate record-keeping. Dolce immediately

disputed this, stating the document should be in the file. John Doe #1 then clarified that

the document was not in her physical folder because the service department is paid

separately at Certified Luxury Motors. Dolce believed the comprehensive inspection report would be located in the same file.

225.    Dolce inquired as to which mechanic within the service department performed the 125-point inspection. John Doe #1 did not directly answer, instead stating that it was their service department and that he needed to submit a request for the document. Dolce then requested copies of all documents within the file. John Doe #1 denied this request. Dolce asked for the reason. She then emphasized that the file contained her financing and service records, and that she requested a copy of all items within the folder.

226.    John Doe #1 took a phone call and then hung up. Dolce reiterated her request for copies of all financing and documentation records. John Doe #1 responded that she would have to wait. Dolce emphasized that she had provided a seven-day notice. John Doe #1 then stated that because a complaint was open they were going to take their time.

227.    Dolce then inquired whether John Doe #1 meant they were going to alter evidence. He responded that they would prepare all necessary materials. Dolce then warned that she had provided ample time and, upon exiting, stated she would involve law enforcement and pursue legal action.

February 24, 2025 - Restaurant

228.    At approximately 1:30 PM, Plaintiff Dolce entered a nearby restaurant.

229.    Plaintiff Dolce spoke with The Owner. During this conversation, The Owner stated that they had observed Defendant Certified Luxury Motors and its employees engage in actions similar to those experienced by Plaintiff.

230. During the conversation, The Owner stated that Certified Luxury Motors had previously operated a lot further down Northern Blvd, toward Queens, and that they had subsequently changed their business name and relocated.

231. During the conversation, The Owner stated that they had observed Defendant, Certified Luxury Motors, engage in a similar pattern of actions at multiple locations.

232. The Owner stated that they had been in business on the same block for multiple decades.

233. During the conversation, The Owner stated that Certified Luxury Motors' staff confronted them. The Owner stated that they responded by expressing concerns about Certified Luxury Motors' business practices.

234. The Owner also stated that Certified Luxury Motors has since refused to communicate with them and made statements regarding their actions.

235. During the conversation, The Owner expressed concern for the safety of individuals purchasing vehicles from Certified Luxury Motors. The Owner also advised Plaintiff Dolce regarding Certified Luxury Motors' actions.

236. During the conversation, The Owner expressed well wishes to Plaintiff Dolce and offered their assistance. The Owner invited Plaintiff to return to discuss the matter further.

February 24, 2025 - In Vehicle

237. At 3:30 PM, Plaintiff Dolce contacted the Nassau County District Attorney's Office about reporting potential crimes and her possession of evidence. The District Attorney's office advised filing a police report with the Nassau County Police Department, Sixth Precinct, as the alleged financial transaction occurred within their jurisdiction. They also

advised that civil liability claims could be pursued in either state or federal court, depending on the specifics of the case.

February 24, 2025 - Parents Home

238.    At approximately 4:00 PM, Plaintiff Dolce visited her parents' home to provide an update. During the visit, her stepfather inquired about the vehicle's condition and her satisfaction. In response, she detailed the events and expressed her frustration.

239.    During the conversation, Plaintiff's stepfather stated that Certified Luxury Motors' representatives had personally assured him, following the test drive, that all four tires would be replaced. He stated this assurance was given after he raised concerns about tire problems and their safety.

240.    Plaintiff Dolce was unaware of this promise as it was made in her absence and her partner's. Her stepfather had departed the dealership prior to the Plaintiffs' financing discussion.

241.    At 4:10 PM, Plaintiff Dolce contacted the Nassau County Police Department - Sixth Precinct. The Officer asked for a brief description of the report and informed her she could file it in person at any time, bringing the accompanying documentation. Dolce informed them she would come immediately to file a report, as instructed by the D.A.'s office.

February 24, 2025 - Nassau County Police Department

242.    Upon arriving at the Nassau County Police Department—Sixth Precinct at approximately 5:59 PM, Plaintiff Dolce was greeted by a female officer. The officer

asked for a preliminary overview and suggested the events might warrant a detective's investigation.

243.    After a brief period, the female officer returned with a male officer, who requested that Plaintiff Dolce recount the situation. Both officers listened to Plaintiff Dolce's account. The officers informed her that they had received complaints regarding Defendant Certified Luxury Motors, its affiliates, and its owners. They also informed her that dealership-related matters often involve ambiguity between civil and criminal liability.

244.    The officers informed Plaintiff Dolce that they were aware of civil cases filed against Certified Luxury Motors involving similar circumstances. They also informed her of the challenges of pursuing criminal charges in dealership-related matters.

245.    Plaintiff Dolce emphasized her desire to file a report that day. She stated that witnessing a young boy and his parents at the dealership earlier in the day caused her significant distress and concern for public safety, especially in light of her own experience.

246.    The officers informed Plaintiff Dolce that they could not file a police report at that time. They instructed the Plaintiff to return if the situation escalated and, in the meantime, to complete a New York State MV104 form. The officers informed her that the MV104 form was relevant to pursuing criminal liability.

February 24, 2025 - Goodworth Residence

247.    Plaintiff Dolce arrived at Plaintiff Goodworth's residence at approximately 7:15 PM to feed his dogs while he was at work. At 7:27 PM, Dolce called Goodworth as she wasn't feeling well. He was concerned about her health, as she had been investigating the

Defendants with a lack of sleep and appetite. He was also aware she had been prescribed Busparone for diagnosed anxiety and wanted to ensure she was taking her medication.

248.    Goodworth advised Dolce to take care with the ongoing situation, as it could trigger panic attacks and anxiety. Dolce explained she was feeling extremely anxious and was "having a mental breakdown." Goodworth remained on the phone with her for several minutes, allowing her time to cry and calm down, as he perceived she was experiencing a panic attack.

249.    After his shift, which ended at 2:00 AM on February 25, 2025, Goodworth spent time in Manhattan consoling Dolce, whom he described as depleted and exhausted.

February 25, 2025 - Goodworth Residence

250.    On February 25, 2025, at approximately 10:00 AM, after conducting online research, Plaintiffs discovered multiple complaints filed against Defendant, Certified Luxury Motors, in the Supreme Court of New York across various counties. These included active cases from consumers in Stamford, CT (see Exhibit A26), Syracuse, NY (see Exhibit A27), and Queens, NY (see Exhibit A28).

251.    Plaintiffs discovered multiple online complaints about Certified Luxury Motors through the Better Business Bureau (BBB) website, where the dealership has an F rating (see Exhibit A29). These complaints closely mirrored the Plaintiffs' experience, with many originating from out-of-state consumers who had purchased vehicles from the dealership.

252.    Plaintiffs found hundreds of detailed complaints about Certified Luxury Motors on Google Reviews. Recent dealership ratings (within three months) were mostly negative.

These complaints mirrored the Plaintiffs' experience, with many from New York City and out-of-state consumers.

253. Plaintiffs found several detailed complaints on DealerRater regarding Certified Luxury Motors, on just the first page (see Exhibit A30). These reviews mirrored their experiences, detailing similar issues with misrepresentation, deceptive sales practices, and post-sale service problems.

254. The sheer volume of detailed consumer complaints that will be entered into evidence demonstrates a consistent pattern of fraudulent activity, including, but not limited to, financing scams, the sale of defective vehicles misrepresented as clean, falsification of vehicle history, and numerous other deceptive practices that substantiate the Plaintiffs position. These complaints, spanning several years, further illustrate the dealership's ongoing racketeering scheme, a structured and deliberate effort to defraud consumers through repeated acts of fraud and deception.

255. Plaintiffs discovered that Fawad Awan, the owner of Certified Luxury Motors, is named in documents related to "NYC Motorcars Corporation," "Alphera International N.A., LLC," and "Sublime Motors Inc." This discovery was based on a previous Fair Labor lawsuit naming him (see Exhibit A31), and a separate active lawsuit between him and his alleged former business partner, Rahman Sayfur (see Exhibit A32). Ironically in that lawsuit, Mr. Awan states that Mr. Rahman engaged in improper dealership practices, regarding the sale of vehicles.

256. The number of business partners, dealerships, assets, and companies owned or associated with Fawad Awan is currently unknown by Plaintiffs.

February 25, 2025 - The Mount Sinai Hospital

257.    On February 25, 2025, at approximately 1:45 PM, Plaintiff Goodworth contacted Defendant Ally Financial Inc. to confirm the statements made during the previous call on February 21, 2025.

258.    Ally Financial Inc. reiterated they do not determine interest rates or loan terms, nor conduct loan underwriting.

259.    Ally Financial Inc. reiterated that they merely "purchase the loan contract" from the dealership, Defendant Certified Luxury Motors.

260.    Ally Financial Inc. reiterated that it does not possess any loan application documents, underwriting documents, or other financial documentation related to the loan and vehicle lien. They confirmed that the sole document is a copy of the contract provided by Defendant Certified Luxury Motors.

261.    Ally Financial Inc. stated that they would fax the contract to Goodworth.

February 26, 2025

262.    On February 26, 2025, at 6:00 PM, Plaintiff Goodworth drove the vehicle to a veterinary clinic at 77 Worth Street in Lower Manhattan for his dog's appointment. While en route to pick up Dolce, the front right tire pressure warning illuminated (see Exhibit A33). He called Dolce at 6:33 PM , panicked, and she attempted to calm him.

263.    Upon arriving to pick up Dolce, Goodworth expressed frustrations with the Defendant and driving anxiety. After retrieving his dog, Dolce drove them back to his residence, feeling composed after taking her anxiety medication.

264.    At approximately 7:30 PM, Plaintiffs arrived at Manchego's Tapas/Wine Bar for dinner (see Exhibit A34). During dinner, Goodworth experienced an anxiety attack and

cried, expressing feeling overwhelmed by the vehicle situation. Dolce consoled him, and they attempted to enjoy the rest of their evening.

February 27, 2025

265.    On February 27, 2025, at approximately 3:30 PM, the Plaintiffs departed Goodworth's residence to retrieve their vehicle from the garage in Brooklyn, NY.

266.    Upon inspection, they discovered the front right tire was severely underinflated, with the tire pressure gauge in the red zone. Plaintiffs then drove the vehicle to a nearby gas station where Goodworth inflated the tire in the rain (see Exhibit A35).

267.    At approximately 3 PM, the Plaintiffs arrived at the mechanic shop referred by Goodworth's barber. They requested Mechanic #2's boss fully examine the vehicle and provide a detailed assessment of the alleged defects. The car was put on a lift for a preliminary check (see Exhibit A36).

268.    Within ten minutes, the shop owner, "Charlie," and Mechanic #2, now known as "Star," identified several major defects with the vehicle. These defects included severely cracked and warped rims on the front tires. Additionally, multiple tires exhibited bubbles, compromising their structural integrity (see Exhibit A37).

269.    Charlie and Star also identified welding marks indicative of prior repairs to the rim. Multiple components of the undercarriage exhibited fractured or torn plastic elements (see Exhibit A38).

270.    The front bumper's underside displayed significant scrape damage (see Exhibit A39). Certified Luxury Motors had claimed the vehicle was reconditioned to the manufacturer's standards.

271.    Star confirmed that North Side Car Care had also inspected and passed the personal vehicle he purchased from Certified Luxury Motors.

272.    During the conversation, Charlie and Star stated that the tire defects were not consistent with normal wear and tear over a 30-day period. They also made statements contradicting the Defendants' claims that a blowout, road conditions, or potholes caused the rim damage.

273.    Charlie further affirmed that the damage was not attributable to Dolce or Goodworth's driving and that all identified issues with the vehicle predated North Side Car Care's inspection on January 11, 2025.

274.    Plaintiffs were also informed that the extremely poor fuel efficiency cited on February 4th was actually due to the vehicle's tire damage.

275.    Charlie agreed to conduct a full and complimentary 125-point inspection of the vehicle and to prepare a detailed analysis of the defects, associated costs, and safety considerations.

276.    Plaintiffs informed Charlie and Star of Dolce's planned trip to Goodworth's upstate residence, for filming for her documentary. Charlie stated that this trip would have to be delayed until at least the tires could be replaced. He also stated that he would attempt to expedite the tire replacement but could not guarantee a specific timeframe.

277.    Plaintiffs left the vehicle at The Mechanic Shop at approximately 5:15 PM and traveled to Goodworth's residence via Uber.

February 28, 2025

278. On February 28, 2025, Plaintiffs received a scanned "6 Page Contract" via fax from PDP Group Inc., acting on behalf of Defendant Ally Financial Inc. (the purported lien holder).

279. At 10:38 AM, the New York State Department of Financial Services confirmed via email that "Certified Luxury Motors" is unlicensed to operate as a financial institution in New York (see Exhibit A40). The Department stated, "I can find no record of Certified Luxury Motors. No name approval and no license application or license."

280. At approximately 3:00 PM, Plaintiffs discovered a review from 6 months ago posted by a consumer regarding Certified Luxury Motors (see Exhibit A41). This review alleges the sale of a vehicle with a tampered Vehicle Identification Number (VIN). The review also describes the display of a false Better Business Bureau (BBB) affiliation. The reviewer states they were arrested due to the VIN discrepancy.

281. Plaintiffs subsequently played back a recording of Jane Doe's phone call on February 21, 2025. This call concerned a purported incorrect VIN number, during which Jane Doe contacted Dolce seeking information about the vehicle. Jane Doe stated, "I'm going to three-way you—" before Dolce, suspecting foul play, made an excuse to disconnect the call.

282. Jane Doe also stated the vehicle was not on the Plaintiffs' insurance and she was attempting to "fix it."

283. Plaintiffs immediately contacted Geico, alarmed by the previous online complaint regarding VIN tampering and the Defendants' potential tampering with their vehicle's VIN.

284.    At 4:30 PM, Geico confirmed no calls were made to Certified Luxury Motors regarding the Plaintiffs' policy. They confirmed the vehicle was insured. This contradicts Jane Doe's February 21, 2025 statements.

**March 1, 2025**

285.    On March 1, 2025, at approximately 3:30 PM, the Plaintiffs retrieved their vehicle from Charlie, who had the severely damaged and cracked rims professionally welded. This process consumed an entire day. Charlie also checked and made necessary fixes to allow the car to travel to Upstate New York. New tires were installed and paid for (see Exhibit A42). Plaintiffs left the mechanic shop at approximately 5:30 PM.

286.    At approximately 11:30 PM, a review of the faxed contract from Ally Financial Inc. led to the discovery of forgeries on Pages 5 and 6 of Goodworth's signatures (see Exhibit A43). Further comparison revealed the entire contract had been replaced from the original marked Exhibit A24. The original contract, "Law 553-NY-eps-14 9/24," was replaced with "Law 553-NY-B-A-e 9/24," containing significantly different amounts and terms.

**March 2, 2025**

287.    On March 2, 2025, the Plaintiffs checked Goodworth's credit report while driving out of Manhattan to go Upstate. They discovered that on January 29, 2025, just four days after Defendant Certified Luxury Motors obtained Goodworth's Social Security Number and private details, he was added as an authorized user to a Capital One Platinum card from 2006 (see Exhibit A44).

288.    Plaintiff Goodworth never requested nor consented to being added as an authorized user on anyone's credit card.

289.    Plaintiff Goodworth never received this purported authorized user credit card.

290.    At approximately 10:00 AM, Plaintiffs placed a fraud alert on Goodworth's Equifax credit report, which Equifax referred to TransUnion and Experian.

291.    At 10:13 AM, the Plaintiffs contacted Capital One from Dolce's phone, engaging in a recorded, hour-and-a-half-long conversation to obtain information about the unauthorized account.

292.    Capital One refused to disclose the identity of the primary cardholder, who had used Goodworth's private information to add him as an authorized user.

293.    Capital One confirmed that the requested information would only be provided pursuant to a subpoena.

294.    Capital One acknowledged the Plaintiffs' statements that this action could lead to their inclusion as a party in future litigation.

March 3, 2025 - DMV

295.    On March 3, 2025, at approximately 1:00 PM, the Plaintiffs arrived at a Department of Motor Vehicles near Buffalo, NY.

296.    Plaintiffs completed a Vehicle Registration/Title Application to modify the registration, specifically to change the license plate number due to the vehicle's history. Upon reaching the service window, a DMV employee informed them that the vehicle's registration had not yet been processed by Defendant Certified Luxury Motors. The employee stated the processing deadline was March 11, 2025, which coincided with the

expiration date of the temporary registration displayed in the vehicle's windshield (see Exhibit A45).

297.    Following the Plaintiffs' explanation, the DMV associate warned that the vehicle would become legally inoperable upon the temporary registration's expiration. She provided a contact number on a piece of paper for the DMV Central Office in Albany, NY: "518-486-9786" (see Exhibit A46).

298.    During the conversation, the DMV associate told the Plaintiffs to notify the DMV Central Office of the current situation. She also made statements regarding court intervention due to the time constraints.

299.    During the inquiry, the DMV associate stated she had limited access to dealership call notes and filings and that the requested information could only be obtained through a subpoena.

March 3, 2025 - New York State Police

300.    Plaintiffs arrived at New York State Police Troop A in Chautauqua County at approximately 2:30 PM to file a report concerning the forgery incident.

301.    Acknowledging his jurisdictional limitations, a State Trooper (whose name will be disclosed to the court upon request) agreed to take a report. During the report, the Trooper made statements regarding Capital One's refusal to provide information and potential legal violations, including cybercrime statutes. He also made statements advising the Plaintiffs to report the forgery to Nassau County, the likely location of the offense, which occurred after they departed the dealership on January 25, 2025.

302.    The State Trooper provided a "Report of Incident Verification" document (see Exhibit A47), outlining the official state police report. The full report can be obtained through an NYS FOIL request or subpoena.

303.    At 3:42 PM, Plaintiff Dolce received a call from Kiara Esperanza, another Certified Luxury Motors customer Dolce had contacted days prior.

304.    During the phone conversation, Esperanza stated that her vehicle's engine failed on a highway two weeks after its purchase and that Certified Luxury Motors refused to honor the warranty.

305.    Esperanza stated that her high-priced vehicle was inoperable and that her insurance declined coverage, citing it as a dealership issue.

306.    Esperanza stated that her Ally Financial loan remained on her credit report despite relinquishing the vehicle and repeated refusals by both companies to resolve the matter.

307.    During the conversation, Esperanza also stated she was pursuing legal action and was willing to testify in this case.

308.    Esperanza then stated that a former employee was willing to testify as a whistleblower to the criminal and egregious acts committed by Certified Luxury Motors and its owner. Esperanza then emailed Dolce the whistleblower's contact information.

309.    The Whistleblower's identifying information is withheld from this complaint due to privacy concerns. The Whistleblower's testimony will be provided at trial. Identifying information may be disclosed upon discovery or the Courts request.

March 6, 2025

310.  On March 6, 2025, at 4:32 PM, Plaintiff Goodworth received an email from an apparent Ally Financial Inc. auto department executive (see Exhibit A48). The email stated a secure message was available in Goodworth's Ally Financial online account.

311.  Plaintiff Goodworth clicked the link, which directed him to a message center within Ally Financial's system (see Exhibit A49).

312.  In the message center, Heather (Executive Customer Relations of Ally Bank) acknowledged receipt of the Plaintiffs' letter concerning Certified Luxury Motors' potential fraudulent conduct and the request for loan freezing.

313.  Heather stated, "We received your concern on March 4, 2025, regarding your Ally auto account. We are researching your concern and will provide a timely response soon.

314.  Goodworth, on an emergency room shift, notified Dolce of the message. Dolce observed that Ally Financial Inc.'s response did not include any requests for information, evidence, or proof of fraud.

315.  Dolce determined that Heather's statement that the formal letter was received on March 4th was inaccurate. Dolce had mailed a Priority Mail Flat Rate Envelope with a signature request to Ally Financial Inc.'s Auto Loan Servicing Department on February 21st. USPS information lists the received date and time as February 27th, 2025, at 1:16 PM, and it was signed by "E. Depetris" (see Exhibit A50).

316.  Plaintiffs then discovered that the $2,000.00 down payment receipt issued by Certified Luxury Motors (see Exhibit A51) was dated December 31, 2024, at 9:14 PM. The vehicle purchase date was January 25, 2025 and the cashier listed was "Yvens."

317.  Plaintiffs reviewed CLM's website privacy policy. The policy does not provide a clear, detailed disclosure of how consumer financial data, including social security

numbers, credit scores and payment information, is collected, stored, or shared with third

parties. While it references the use of third-party payment processors, it does not specify

whether consumer financial information is sold, transferred, or retained beyond the

original financing transaction. Additionally, the policy does not include a direct opt-out

mechanism for financial data sharing, nor does it clarify the security measures in place to

protect such sensitive information.

318.    Defendants' actions have caused Goodworth significant credit and financial injury,

including a reduction of his credit score and rating, fraudulent credit cards on his credit

report, and unauthorized loans reported in his name.

319.    Plaintiff Goodworth also discovered multiple unauthorized credit inquiries from

unknown sources in the days and weeks after January 25th.

March 11, 2025

320.    Plaintiff Goodworth checked his physical mailbox in Brooklyn at approximately 9:00

AM, as his temporary vehicle registration was due to expire that day. The official vehicle

registration was not found.

321.    Plaintiff Goodworth's mother also checked the mailbox at his Chautauqua County

residence at noon. The official vehicle registration was not there.

322.    Plaintiffs arrived at 4:15 PM for their scheduled appointment at the Department of

Motor Vehicles, 366 West 31st Street, New York, NY 10001.

323.    Plaintiffs notified a window clerk of the impending expiration of their temporary

vehicle registration. The clerk accessed the vehicle registration system and found that

Defendant Certified Luxury Motors had not completed the registration paperwork

processing. During the interaction, the clerk stated she was unable to finalize the registration and directed them to a supervisor for further assistance.

324.    Plaintiffs were directed to Window 7, where they spoke with a supervisor regarding the aforementioned registration issue. The supervisor's name is omitted from this complaint but will be provided to the Court upon request.

325.    During the conversation, the supervisor stated that the Department's office lacked the authority to complete the registration, as Defendant Certified Luxury Motors had initiated the process. She also made statements regarding the dealership's obligation to complete the registration and characterized the dealership's alleged delay of the registration as unlawful.

326.    The supervisor provided information regarding potential resources within other departments that might exert pressure on the dealership. She also made statements expressing uncertainty regarding their efficacy.

327.    The supervisor stated that any notes or internal records pertaining to the vehicle in question could not be released to the Plaintiffs without a duly issued subpoena.

328.    Plaintiffs exited the Department of Motor Vehicles at 5:00 PM.

329.    Plaintiffs' vehicle registration lapsed at midnight on March 12, 2025. This lapse occurred because Defendant Certified Luxury Motors and their agents allegedly did not comply with the 45-day statutory deadline for registration processing.

March 12, 2025

330.    The DMV-Bureau of Consumer & Facility Services clarified over the phone that Defendant Certified Luxury Motors was required to process the sales transaction within **five days** and mail the original registration to Plaintiffs within 45 days.

331.    Defendant Certified Luxury Motors demonstrably violated New York Codes, Rules and Regulations Title 15, Section 78.23, subsection (e)(1) by failing to process and/or submit the required information to the Department of Motor Vehicles within the mandated five-day period. This violation occurred prior to the emergence of any disputes between the Plaintiffs and the Defendant, establishing a clear pattern of non-compliance and evidencing an intent to defraud and engage in unlawful activities.

332.    Plaintiffs reserve the right to amend this claim pending further discovery.

## IV. CLAIMS FOR RELIEF

**First Claim for Relief: Civil RICO (18 U.S.C. § 1964(c))**

Against All Defendants.

333.    Plaintiffs incorporate by reference all preceding allegations as if fully stated herein.

334.    Defendants operated a coordinated criminal enterprise in violation of 18 U.S.C. § 1962(c), engaging in a systematic pattern of fraudulent vehicle sales, forged financing documents, and deceptive loan practices. This enterprise, consisting of Certified Luxury Motors, Ally Financial Inc., North Side Car Care, and others, engaged in predicate acts of wire fraud (18 U.S.C. § 1343), mail fraud (18 U.S.C. § 1341), and bank fraud (18 U.S.C. § 1344) including related New York State statute and common law violations. Defendants' scheme was not limited to Plaintiffs but extended to numerous consumers, creating a recurring and systematic pattern of fraudulent conduct designed to extract unlawful financial gain through falsified contracts and deceptive financing terms. The financial harm suffered by Plaintiffs was a direct and proximate result of this racketeering activity.

335.   Defendants committed at least two predicate acts of fraud, including but not limited to:

    a.   Forging loan documents and submitting false information to Ally Financial Inc.

    b.   Engaging in deceptive auto sales practices, false vehicle inspections, false advertising, and falsification of business records.

    c.   Declining to investigate fraud and attempting to enforce a fraudulent loan.

    d.   Knowingly reporting false information to credit bureaus and engaging in unlawful debt collection efforts by sending loan bills amidst being notified of fraud concerns.

336.   Defendants' actions were part of an ongoing scheme to defraud multiple consumers, demonstrating continuity of illegal activity and criminal intent.

337.   As a direct and proximate result of Defendants' racketeering activities, Plaintiffs suffered financial loss, emotional distress, and damage to their creditworthiness.

338.   As a result of Defendants' RICO violations, Plaintiffs are entitled to:

    a.   Treble damages.

    b.   Compensatory and punitive damages.

    c.   Reasonable attorneys' fees and costs.

    d.   Such other relief as the Court deems just and proper.

**Second Claim for Relief: Bank Fraud (18 U.S.C. § 1344)**

Against Defendants: Certified Luxury Motors, Worldwide Luxury Enterprises Inc., Ally Financial Inc., Fawad Awan, John Doe #1, John Doe #2, Jane Doe

339.   Plaintiffs incorporate by reference all preceding allegations as if fully stated herein.

340.    Defendants engaged in bank fraud in violation of 18 U.S.C. § 1344 by knowingly submitting fraudulent loan applications to Ally Financial Inc., misrepresenting the vehicle's value, terms, and associated fees. Defendants also included forged signatures and altered loan documents to induce Ally Financial to approve and/or procure an otherwise unlawful transaction. Additionally, Ally Financial was complicit in this fraud by not conducting proper due diligence by obtaining all underlying financial documentation to support an approval of the contract. Additionally, Ally Financial allowed Certified Luxury Motors to act as an unlicensed underwriter of the loan by permitting CLM to set the terms of the interest rate, and contract offer. This was a breach of their duty as the purported original lender which CLM alleges they currently are.

341.    As a direct and proximate result of Defendants' actions, Plaintiffs suffered financial damages, credit harm, and emotional distress.

342.    As a result of Defendants' bank fraud, Plaintiffs are entitled to:

    a.  Full cancellation of the fraudulent loan.

    b.  Statutory damages.

    c.  Compensatory damages.

    d.  Punitive damages.

    e.  Reasonable attorneys' fees and costs.

**Third Claim for Relief: Wire Fraud (18 U.S.C. § 1343)**

Against All Defendants.

343.    Plaintiffs incorporate by reference all preceding allegations as if fully stated herein.

344.   Defendants engaged in wire fraud (18 U.S.C. § 1343) by using interstate electronic communications—including online vehicle advertisements, text messages, and email exchanges—to lure consumers into fraudulent vehicle transactions and predatory loans. These acts were integral to the fraudulent scheme, ensuring the misrepresentation of the vehicle's condition, warranty, financing terms, and legal obligations.

345.   Specifically:

    a.   Certified Luxury Motors submitted false and misleading documents electronically to lenders, including Ally Financial Inc. They also advertised online non-existent guarantees such as the comprehensive 100 day warranty which was allegedly by Headstart Warranty Group, a 125 point vehicle inspection, among other falsehoods.

    b.   North Side Car Care submitted false and misleading inspections electronically to New York State, Certified Luxury Motors, and consumers.

    c.   Ally Financial Inc. processed, approved, and attempted to enforce a fraudulent loan using electronic means.

346.   As a direct result of Defendants' wire fraud, Plaintiffs suffered financial damages, credit harm, and emotional distress.

347.   As a result of Defendants' wire fraud, Plaintiffs are entitled to:

    a.   Compensatory damages.

    b.   Punitive damages.

    c.   Statutory penalties.

**Fourth Claim for Relief: Mail Fraud (18 U.S.C. § 1341)**

Against Defendants: Certified Luxury Motors, CLM Auto Group Inc., Worldwide Luxury Enterprises Inc., and Ally Financial Inc.

348.    Plaintiffs incorporate by reference all preceding allegations as if fully stated herein.

349.    Defendants engaged in mail fraud in violation of 18 U.S.C. § 1341 by sending fraudulent financial, banking, and loan statements through mail services.

350.    Specifically:

    a.   Certified Luxury Motors sent false financial agreements, deceptive auto sale documents, and fraudulent loan paperwork to Ally Financial Inc.

    b.   Ally Financial Inc. sent paperwork and billing statements based on a forged and fraudulent contract.

    c.   Ally Financial Inc.'s refusal to investigate reported fraud suggests complicity.

351.    As a result of Defendants' fraudulent mailings, Plaintiffs suffered financial harm.

352.    As a result of Defendants' mail fraud, Plaintiffs are entitled to:

    a.   Compensatory and punitive damages.

    b.   Statutory penalties.

    c.   Such further relief as the Court deems just and proper.

**Fifth Claim for Relief: Truth in Lending Act (TILA) Violations (15 U.S.C. § 1601 et seq.)**

Against Defendants: Ally Financial Inc., Certified Luxury Motors, CLM Auto Group Inc., Worldwide Luxury Enterprises Inc., John Doe #2

353.    Plaintiffs incorporate by reference all preceding allegations as if fully stated herein.

354.    Defendants violated the Truth in Lending Act (15 U.S.C. § 1601) by failing to provide accurate disclosures regarding the finance charges, and total amount financed.

The financing documents failed to disclose all of the fees incorporated into the loan inflating the actual cost beyond what was advertised. The loan also incorporated illegal fees such as an additional down payment which wasn't taken off but put into the loan and a loan pre qualification fee. These omissions and illegalities deprived Plaintiffs of their statutory right to fully understand the loan terms before signing, and being offered lawful terms, constituting a direct violation of TILA.

355. Specifically:

    a. Certified Luxury Motors provided false loan terms to Ally Financial, securing a fraudulent contract based on forged documentation.

    b. Ally Financial Inc. failed to conduct due diligence in underwriting and verifying loan terms, enforcing an unlawful financial obligation on the Plaintiffs.

    c. Ally Financial Inc. permitted Certified Luxury Motors to function as a lender by authorizing John Doe #2 to underwrite loan terms without disclosing this arrangement to the Plaintiffs, and then Ally Financial Inc. "Purchased" the contract.

356. As a result, the Plaintiffs suffered fraudulent financial obligations, credit harm, and financial distress.

357. As a result of Defendants' TILA violations, Plaintiffs are entitled to:

    a. Full loan cancellation.

    b. Statutory damages.

    c. Reasonable attorneys' fees and costs.

**Sixth Claim for Relief: Fair Credit Reporting Act (FCRA) Violations (15 U.S.C. § 1681 et seq.)**

Against Defendant: Ally Financial Inc.

358.  Plaintiffs incorporate by reference all preceding allegations as if fully stated herein.

359.  Defendant Ally Financial Inc. violated the Fair Credit Reporting Act (FCRA), 15

U.S.C. § 1681 et seq., by reporting a fraudulent loan to credit bureaus, negatively

impacting the Plaintiff's credit scores.

360.  Defendant Ally Financial Inc. failed to conduct a reasonable investigation after

receiving disputes regarding the fraudulent loan.

361.  As a direct result, the Plaintiffs suffered credit damage, financial harm, and

reputational injury.

362.  As a result of Defendant's FCRA violations, Plaintiffs are entitled to:

a.  Correction of all fraudulent credit entries.

b.  Statutory and punitive damages.

c.  Reasonable attorneys' fees and costs.

363.

**Seventh Claim for Relief: (Unjust Enrichment – New York Common Law)**

Against All Defendants.

364.  Plaintiffs repeat and reallege each and every allegation set forth above as if fully set

forth herein.

365.  Defendants were unjustly enriched through fraudulent misrepresentations and a

deceptive bait-and-switch financing scheme that misled Plaintiffs into incurring excessive

costs beyond those agreed upon. Defendants even exacerbated the fraud by then changing

the contract without consent of Plaintiffs and then forging Goodworth's name several

times on that document. Any contractual obligation claimed by Defendants is voidable

due to fraudulent inducement, and a contract riddled in forgery making unjust enrichment

an independent cause of action.

366.    Plaintiffs paid money under false pretenses, making Defendants liable for restitution.

367.    Defendants' unjust enrichment warrants full restitution of all amounts paid, punitive

damages, and attorneys' fees.

**Eigth Claim for Relief: Violation of the Gramm-Leach-Bliley Act (15 U.S.C. §§ 6801-6827)**

Against Defendants: Certified Luxury Motors, CLM Auto Group Inc., Worldwide Luxury

Enterprises Inc., Fawad Awan

368.    Plaintiffs incorporate by reference all preceding allegations as if fully stated herein.

369.    Certified Luxury Motors, a business that is significantly involved in financial

activities, violated the Gramm-Leach-Bliley Act by failing to provide clear privacy

notices and adequate opt-out mechanisms regarding the sharing of consumer financial

data.

370.    Certified Luxury Motors improperly disclosed how consumer financial data is used

and shared.

371.    As a result of these violations, Plaintiffs are entitled to:

a.    Declaratory judgment that Certified Luxury Motors violated the GLBA.

b.    Injunctive relief requiring Certified Luxury Motors to comply with the GLBA.

c.    Monetary damages.

d.    Reasonable attorneys' fees and costs.

**Ninth Claim for Relief: Violation of the Magnuson-Moss Warranty Act (15 U.S.C. §§ 2301-2312)**

Against Defendants: Certified Luxury Motors, CLM Auto Group Inc., Worldwide Luxury Enterprises Inc., Fawad Awan, John Doe #1, John Doe #2, John Doe #3, Jane Doe

372.    Plaintiffs incorporate by reference all preceding allegations as if fully stated herein.

373.    Defendants violated the Magnuson-Moss Warranty Act (15 U.S.C. §§ 2301-2312) by falsely advertising a "comprehensive warranty" as part of the vehicle sale. Then providing documentation implying that Headstart Warranty Group was the written warranty for the vehicle. Only for Plaintiffs to uncover that no such warranty existed and Defendants back tracked on their previous statements. Defendants failed to honor the warranty and misrepresented its existence. Plaintiffs relied on these false statements in purchasing the vehicle, suffering financial loss and vehicle defects without the promised coverage.

374.    Defendants later contradicted this representation by claiming the warranty was the New York State Lemon Law (a statute, not an actual warranty). Demonstrating a failure to clearly and consistently disclose the terms of the warranty.

375.    These misrepresentations and failures to disclose violated the requirements of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301-2312.

376.    As a result of Defendants' violations of the Magnuson-Moss Warranty Act, Plaintiffs are entitled to:

    a.    Monetary damages.

    b.    Reasonable attorneys' fees and costs.

    c.    Such other relief as the Court deems just and proper.

**Tenth Claim for Relief: Fraudulent Misrepresentation (New York Common Law)**

Against Defendants: Certified Luxury Motors, CLM Auto Group Inc., Worldwide Luxury

Enterprises Inc., North Side Car Care Corporation, Fawad Awan, John Doe #1, John Doe #2,

John Doe #3, Jane Doe

377. Plaintiffs incorporate by reference all preceding allegations as if fully stated herein.

378. On January 25, 2025, Defendant Jane Doe falsely represented that the vehicle underwent a "125-point inspection" and was "pre-certified," despite knowledge that no such inspection was performed. John Doe #1 affirmed these assertions. John Doe #1 and #2 misrepresented the warranty regarding Headstart Warranty Group and the New York State Lemon Law. John Doe #3 knowingly misrepresented the vehicle's condition as Plaintiffs fault, when Defendants were aware of the vehicle's defects prior to the incident. Defendants later falsely claimed a warranty existed when no such coverage was registered. North Side Car Care Corporation passed a defective vehicle's inspection as road safe given the clear defects of bald tires and cracked rims. These misrepresentations were made knowingly and intentionally to induce Plaintiffs to purchase a defective vehicle under fraudulent terms, constituting fraudulent misrepresentation.

379. Defendants knew these representations were false and made them with the intent to deceive Plaintiffs.

380. Plaintiffs reasonably relied on these false representations in purchasing the vehicle.

381. As a result of Defendants' fraudulent misrepresentations, Plaintiffs have suffered damages and are entitled to:

    a. Restitution.

    b. Monetary damages.

**Eleventh Claim for Relief: Forgery & Falsification of Business Records (New York Common Law)**

Against All Defendants.

382. Plaintiffs incorporate by reference all preceding allegations as if fully stated herein.

383. Defendants falsified a state vehicle inspection record to further their scheme.

384. Defendants created and/or altered loan documents and falsified business records.

385. Defendants acted with fraudulent intent in creating and/or altering these records.

386. Defendants used these forged and falsified records to secure fraudulent financing and to deceive the Plaintiffs.

387. Defendants attempted to enforce a fraudulently obtained and funded loan.

388. As a result of Defendants' forgery and falsification of business records, Plaintiffs have suffered damages and are entitled to:

    a. The loan being declared void.

    b. Monetary damages.

**Twelfth Claim for Relief: Fraudulent Scheme (New York Common Law - Fraud)**

Against All Defendants.

389. Plaintiffs incorporate by reference all preceding allegations as if fully stated herein.

390. Defendants engaged in a coordinated scheme to defraud Plaintiffs.

391. This scheme involved intentional misrepresentations of material fact, including false advertising, misrepresentations of vehicle condition, and forged loan documents.

392.    Defendants knew these representations were false and made them with the intent to deceive Plaintiffs.

393.    Plaintiffs justifiably relied on these misrepresentations.

394.    As a result of Defendants' fraudulent scheme, Plaintiffs have suffered damages and are entitled to:

    a.    Restitution.

    b.    Compensatory damages.

    c.    Punitive damages.

**Thirteenth Claim for Relief: Civil Identity Theft (Invasion of Privacy/Misappropriation of Identity)**

Against Defendants: Certified Luxury Motors, CLM Auto Group Inc., Worldwide Luxury Enterprises Inc., Fawad Awan, John Doe #2

395.    Plaintiffs incorporate by reference all preceding allegations as if fully stated herein.

396.    Defendants submitted a contract to Ally Financial containing fraudulent alterations and forged signatures, unlawfully using Plaintiff Goodworth's identity to secure an illicit financial arrangement. This unauthorized use of identity was done with the intent to defraud Plaintiffs and financial institutions, constituting misappropriation of identity and civil identity theft.

397.    Defendants' unauthorized use of Plaintiffs' identity caused financial and emotional distress to Plaintiffs.

398.    As a result of Defendants' civil identity theft, Plaintiffs are entitled to:

    a.    Compensatory damages.

    b.  Punitive damages.

    c.  Injunctive relief to prevent further misuse of Plaintiffs' identity.

## Fourteenth Claim for Relief: Deceptive Business Practices (NY GBL § 349)

Against All Defendants.

399.    Plaintiffs incorporate by reference all preceding allegations as if fully stated herein.

400.    Defendants engaged in deceptive acts and practices, including deceptive sales practices, false advertising, improper loan disclosure, illegal funding, and record falsification.

401.    These deceptive acts and practices were consumer-oriented and materially misleading.

402.    Plaintiffs suffered injury as a result of Defendants' deceptive acts and practices.

403.    As a result of Defendants' violations of New York General Business Law § 349, Plaintiffs are entitled to treble damages.

## Fifteenth Claim for Relief: False Advertising (NY GBL § 350)

Against Defendants: Certified Luxury Motors, CLM Auto Group Inc., Worldwide Luxury Enterprises Inc., Fawad Awan, John Doe #1, John Doe #2, John Doe #3, Jane Doe

404.    Plaintiffs incorporate by reference all preceding allegations as if fully stated herein.

405.    Defendants engaged in false advertising.

406.    Defendants' advertising was misleading in a material respect, including advertising a vehicle at a false price and misrepresenting its condition. Defendants also misrepresented a warranty.

407. As a result of Defendants' false advertising, Plaintiffs are entitled to:

    a.  Civil penalties.

    b.  Monetary damages.

## Sixteenth Claim for Relief: Auto Dealer Fraud (NY VTL § 415)

Against Defendants: Certified Luxury Motors, CLM Auto Group Inc., Worldwide Luxury Enterprises Inc., Fawad Awan, John Doe #1, John Doe #2, John Doe #3, Jane Doe

408. Plaintiffs incorporate by reference all preceding allegations as if fully stated herein.

409. Defendants, as auto dealers, engaged in deceptive practices.

410. These deceptive practices were material, including failing to disclose the vehicle's material defects.

411. Plaintiffs relied on these deceptive practices.

412. Plaintiffs suffered financial loss as a result of Defendants' deceptive practices.

413. As a result of Defendants' violations of New York Vehicle and Traffic Law § 415, Plaintiffs are entitled to:

    a.  Restitution.

## Seventeenth Claim for Relief: Breach of Implied Warranty of Merchantability (UCC 2-314)

Against Defendants: Certified Luxury Motors, CLM Auto Group Inc., Worldwide Luxury Enterprises Inc., Fawad Awan, John Doe #1, John Doe #2, John Doe #3, Jane Doe

414. Plaintiffs incorporate by reference all preceding allegations as if fully stated herein.

415. Defendants, as merchants, sold a vehicle to Plaintiffs.

416. The vehicle was not merchantable at the time of sale due to undisclosed defects.

417. Defendants' breach of the implied warranty of merchantability caused damages to Plaintiffs.

418. As a result of Defendants' breach of the implied warranty of merchantability, Plaintiffs are entitled to:

    a. A refund of the purchase price.

    b. Reimbursement of repair costs.

    c. Monetary damages.

**Eighteenth Claim for Relief: Unconscionability (New York Common Law)**

Against Defendants: Certified Luxury Motors, CLM Auto Group Inc., Worldwide Luxury Enterprises Inc., Ally Financial Inc., Fawad Awan, John Doe #1, John Doe #2, John Doe #3, Jane Doe

419. Plaintiffs incorporate by reference all preceding allegations as if fully stated herein.

420. The financing contract entered into by Plaintiffs and Defendants were unconscionable.

421. The financing contract presented to Plaintiffs contained egregiously unfair terms, including fabricated fees and deceptive pre-certification charges. Plaintiffs were subjected to a high-pressure sales environment, and intentional misrepresentation, which deprived them of a meaningful opportunity to review terms. Plaintiffs were also subjected to a change in contract without consent, supported by forgeries of Goodworth's signature. Given Defendants' fraudulent tactics, this contract is unconscionable under New York common law and should be declared void.

422.  These agreements were substantively unconscionable due to the imposition of harsh, illegal, or one-sided loan terms.

423.  As a result of the unconscionability of the agreements, Plaintiffs are entitled to:

    a.  Rescission of the contracts.

    b.  Monetary damages.

## Nineteenth Claim for Relief: Negligence (New York Common Law)

Against All Defendants.

424.  Plaintiffs incorporate by reference all preceding allegations as if fully stated herein.

425.  Defendants owed a duty of care to Plaintiffs to exercise reasonable care in inspecting and disclosing the vehicle's condition and the loan.

426.  Defendants breached this duty of care by failing to exercise reasonable care in inspecting and disclosing the vehicle's condition and the loan.

427.  This breach of duty was the proximate cause of the safety defects in the vehicle.

428.  Plaintiffs suffered damages as a result of these safety defects.

429.  As a result of Defendants' negligence, Plaintiffs are entitled to:

    a.  Compensatory damages.

## Twentieth Claim for Relief: Gross Negligence (New York Common Law)

Against All Defendants.

430.  Plaintiffs incorporate by reference all preceding allegations as if fully stated herein.

431.  Defendants owed a duty of care to Plaintiffs.

432.  Defendant North Side Car Care Corporation engaged in conduct demonstrating a reckless disregard for the rights of Plaintiffs, specifically by passing inspection for a clearly defective vehicle.

433.  Defendant Certified Luxury Motors and employees knowingly sold a defective vehicle and repeatedly misrepresented repairs. Defendants also intentionally attempted to conceal its defects, such as spray painting rims to hide cracks and dents. These rims subsequently caused a tire blowout.

434.  Defendant Ally Financial Inc. engaged in gross negligence by failing to conduct proper due diligence in acquiring the loan associated with Plaintiffs' vehicle purchase. Specifically, Ally Financial:

   a.  Ally Financial admitted on multiple occasions that it did not underwrite the loan and merely purchased the contract from Certified Luxury Motors, which was unlawfully acting as a bank, lender, and/or creditor despite lacking the necessary licensing within the State of New York.

   b.  Neglected to ensure proper documentation was obtained and maintained during the loan acquisition process, including refusing to provide full financing documentation upon Plaintiffs' request.

   c.  Failed to conduct a legitimate investigation once notified by Plaintiffs of potential fraud, disregarding its obligation to assess the legitimacy of the loan and the legality of its origination.

435.  This reckless disregard was the proximate cause of damages suffered by the Plaintiffs.

436.  As a result of Defendants' gross negligence, Plaintiffs are entitled to:

   a.  Compensatory damages.

 b. Punitive damages.

**Twenty-first Claim for Relief: Pain and Suffering (New York Common Law)**

Against All Defendants.

437. Plaintiffs incorporate by reference all preceding allegations as if fully stated herein.

438. Defendants knowingly sold a defective vehicle, resulting in a catastrophic tire failure at high speeds on the FDR Drive. Dolce was physically injured by this tire blowout causing nerve pain in her right arm and lower back. Plaintiffs were both placed in immediate risk of severe injury or death due to Defendants' reckless disregard for vehicle safety. The psychological trauma, physical pain, fear, and emotional distress suffered as a result of this life-threatening incident constitute pain and suffering damages under New York common law.

439. Plaintiff Dolce now requires physical therapy due to the tire blowout incident.

440. Both Plaintiffs now require mental health therapy due to the emotional distress.

441. Defendants' conduct directly caused this emotional distress and physical pain.

442. As a result of Defendants' conduct, Plaintiffs have suffered pain and suffering and are entitled to:

 a. Damages for medical bills.

 b. Damages for therapy.

 c. Damages for pain and suffering.

**Twenty-second Claim for Relief: Breach of Express Warranty (UCC 2-313)**

Against Defendants: Certified Luxury Motors, CLM Auto Group Inc., Worldwide Luxury Enterprises Inc., Fawad Awan, John Doe #1, John Doe #2, John Doe #3, Jane Doe

443. Plaintiffs incorporate by reference all preceding allegations as if fully stated herein.

444. Defendants expressly warranted that the vehicle had undergone a "125-point inspection" and came with a comprehensive dealership-backed warranty. These statements, both verbal (Jane Doe, John Doe #1, John Doe #2, on several occasions) and written, were material terms relied upon by Plaintiffs in deciding to purchase the vehicle. The failure to provide a vehicle meeting these terms constitutes a breach of express warranty under UCC 2-313.

445. These representations constituted affirmations of fact or promises relating to the goods, creating express warranties under UCC 2-313.

446. Defendants breached these express warranties by later contradicting their initial representations, claiming the warranty was the New York State Lemon Law, and failing to honor the express warranty initially represented.

447. As a direct result of Defendants' breach of express warranties, Plaintiffs have suffered damages.

448. As a result of Defendants' breach of express warranties under UCC 2-313, Plaintiffs are entitled to:

    a. Monetary damages.

    b. Reimbursement of repair costs.

    c. Any other remedies available under the UCC.

**Twenty Third Claim For Relief: Violation of New York Lemon Law  (N.Y. Gen. Bus. Law §198-a et seq.):**

Against Defendants: Certified Luxury Motors, CLM Auto Group Inc., Worldwide Luxury Enterprises, Inc., Fawad Awan, John Doe #1, John Doe #2, John Doe #3, and Jane Doe

449.    Plaintiff re-alleges and incorporates by reference the allegations set forth in all preceding paragraphs as though fully set forth herein.

450.    Defendants engaged in unlawful business practices by knowingly misrepresenting the warranty coverage of the vehicle sold to Plaintiff in violation of New York General Business Law §198-a, also known as the New York Lemon Law.

451.    Defendants first represented to Plaintiff that the vehicle was covered by a 30-day warranty through the dealer at the time of sale.

452.    Defendants then contradicted their prior representation by stating that the vehicle was covered under Headstart Warranty Group, a third-party warranty provider. Defendants provided Plaintiff with written documentation reflecting this representation.

453.    Defendants subsequently reversed their statement again, falsely claiming that the only warranty applicable was the Lemon Law warranty, in an apparent effort to mislead and deter Plaintiff from exercising their rights.

454.    Defendants intentionally concealed and failed to disclose known material defects in the vehicle, including but not limited to mechanical and operational issues that substantially impaired the use, value, or safety of the vehicle.

455.    Under the New York Lemon Law (N.Y. Gen. Bus. Law §198-a), if a dealer is unable to repair a vehicle to conform to the terms of the warranty after a reasonable number of attempts, the dealer must either replace the vehicle or refund the full purchase price. Defendants failed to fulfill this obligation.

456.    By selling a defective vehicle without disclosure of its material defects and deliberately misrepresenting the warranty coverage, Defendants engaged in deceptive and fraudulent business practices in violation of New York law.

457.    As a direct and proximate result of Defendants' violations of the New York Lemon Law, Plaintiff has suffered substantial damages, including but not limited to financial loss, costs associated with attempted repairs, loss of use of the vehicle, and emotional distress.

458.    Plaintiff is entitled to the following relief pursuant to N.Y. Gen. Bus. Law §198-a:

a.    A full refund of the purchase price paid for the vehicle;

b.    Reimbursement for all costs associated with attempted repairs and incidental damages;

c.    Statutory damages, including treble damages where applicable;

d.    Attorneys' fees and costs of litigation; and

e.    Any other relief that the Court deems just and proper.

## V. Exhibit Summary

459.    Plaintiffs have secured substantial documentary evidence supporting all factual background statements herein. This includes hundreds of pages and files including contracts, call logs, emails, text messages, advertisements, consumer complaints, video, photographs and dealership correspondence, as well as several hours of recorded audio evidence, all of which were obtained lawfully and are fully admissible.

460.    To streamline this complaint and to avoid overwhelming the court, only select exhibits are attached and cited in the complaint for reference, while the remaining evidence will be submitted during discovery and trial. Additional exhibits can be

provided upon request of the Court, should further factual verification be required at this stage.

## VI. Prayers For Relief

**WHEREFORE,** Plaintiffs respectfully request that this Court grant the following relief:

461.   Judgment against Defendants, jointly and severally, for full statutory damages under each federal law violated.

462.   Judgment against Defendants, jointly and severally, for treble damages where applicable.

463.   Judgment against Defendants, jointly and severally, for compensatory and actual damages to redress financial and personal harm suffered by Plaintiffs.

464.   Judgment against Defendants, jointly and severally, for punitive damages in an amount exceeding $5,000,000.00 to deter future misconduct.

465.   An order permanently closing Certified Luxury Motors and dissolving Fawad Awan's related companies (CLM Auto Group Inc., Worldwide Luxury Enterprises Inc., etc.).

466.   An order permanently closing North Side Car Care and dissolving the related company.

467.   An order forcing the dissolution of any business owned by Fawad Awan and his agents.

468.   An order banning Fawad Awan and his employees from starting, acquiring, or operating any business within the region for a period of no less than five (5) years.

469.   An order referring Ally Financial Inc. for further investigation into their fraudulent lending practices.

470.   An order establishing a restitution fund to compensate all victims defrauded by Certified Luxury Motors, Ally Financial Inc., North Side Car Care, and all of their agents and co-conspirators.

471.   An order referring potential criminal violations to the appropriate law enforcement authorities for investigation.

472.   An award of reasonable attorneys' fees and costs of litigation.

473.   Such other and further relief as the Court deems just and proper.

**SIGNATURE**

Respectfully submitted,

PERSEPHONE DOLCE
Pro Se Plaintiff
New York, NY
DolceGoodworthLegal@gmail.com

DARIUS L. GOODWORTH
Pro Se Plaintiff
Brooklyn, NY
DolceGoodworthLegal@gmail.com

## EXHIBITS TABLE OF CONTENTS

| Exhibit # | Type of Exhibit | Evidentiary Relevance | Redaction Status (left blank if not redacted) |
|---|---|---|---|
| A1 | Screenshot | Certified Luxury Motors' own expressed website guarantees, and promises regarding a comprehensive 100 day warranty, 125 point inspection, etc. | |
| A2 | Screenshot | The cars.com ad from Certified Luxury Motors featuring the A220 that Plaintiffs initially inquired about | |
| A3 | Camera Scan | Purported financing breakdown, handwritten by John Doe #2 | |
| A4 | Screenshot | Proof of text message from Dolce to Jane Doe | |
| A5 | Camera Picture | The warranty packet Plaintiffs were given the day of purchase | Yes - Private cell phone of Defendant. |
| A6 | Screenshot | Proof of text message from Jane Doe | |
| A7 | Screenshot | Proof of text message from unknown sender to Plaintiff | Yes - a private cell phone number. |
| A8 | Screenshot | Proof of text messages from Jane Doe | |
| A9 | Screenshot | Credit Card Purchase | Yes- credit card.. |

| A10 | Camera Picture | Proof of tire pressure warning | |
| A11 | Screenshot | Proof of towing from insurance and roadside assistance request | |
| A12 | Screenshot | Proof of text to Jane Doe | |
| A13 | Camera Picture | Proof of towing | |
| A14 | Screenshot | Proof of text to Jane Doe | Yes - garage vehicle # |
| A15 | Email Print PDF | Proof of demand letter to Certified Luxury Motors | Yes- private emails |
| A16 | Screenshot | Online Advertisement on Certified Luxury Motors website of Plaintiffs A35 Amg | |
| A17 | Camera Picture | Proof of left front tire rim's damage, cracks, etc. | |
| A18 | Screenshot | Proof of call to Mercedez Benz Manhattan | |
| A19 | Camera Scan | All the financing paperwork provided by John Doe #2 | Yes - Social security #, Private employment info |

| A20 | Camera Picture | Business card provided by John Doe #2 | |
| A21 | Camera Scan | NYS Safety and Emissions Vehicle Inspection Report | |
| A22 | Camera | Proof of | Yes- Credit card number |

| | Scan | purchase/time/location | |
|---|---|---|---|
| A23 | Camera Scan | Proof of mailing to Ally Financial Inc. | Yes - Credit card number |
| A24 | Camera Scan | Original Contract Signed by Goodworth | Yes - Private residential address |
| A25 | Download PDF | Electronic bill sent by Ally Financial Inc. | |
| A26 | Download PDF | Proof of active (at time of complaint submission) lawsuit against Certified Luxury Motors. | |
| A27 | Download PDF | Proof of active (at time of complaint submission) lawsuit against Certified Luxury Motors | |
| A28 | Download PDF | Proof of active (at time of complaint submission) lawsuit against Certified Luxury Motors | |
| A29 | Screenshot | Certified Luxury Motors BBB landing profile, and BBB "F" grade | |
| A30 | Screenshot | First page of complaints on Dealer rater regarding Certified Luxury Motors | |
| A31 | Download PDF | Previous fair labor lawsuit naming Fawad Awan | |
| A32 | Download PDF | Active lawsuit between Fawad Awan | |

| | | and purported ex-business partner "Rahman Sayfur" | |
|---|---|---|---|
| A33 | Screenshot/ Camera Picture | Proof of text messages from Goodworth on 2/26 | |
| A34 | Camera Scan | Proof of dinner at Manchego's | Yes - Credit card number |
| A35 | Camera Picture | Goodworth inflating the front right tire in the rain | |
| A36 | Camera Picture | The vehicle being put on a lift at Car Doc Automotive | |
| A37 | Camera Picture | Tire damage close up pictures | |
| A38 | Camera Picture | Undercarriage torn plastic | |
| A39 | Camera Picture | Front bumper underside scraping | |
| A40 | Email Print PDF | NYS Department of Financial Services confirmation that Certified Luxury Motors has no financial institution licenses | Yes- Private email. |
| A41 | Screenshot | Consumer review on Certified Luxury Motors | |
| A42 | Camera Scan | Repairs payment receipt | |
| A43 | Download | Proof of changed | Yes- Credit card number |

| | PDF | contract without consent, terms, and forged signatures (compare with Exhibit A34) | |
|---|---|---|---|
| A44 | Screenshot | Capital One credit card alert on Goodworth's Equifax report | |
| A45 | Camera Picture | The Vehicle's temporary registration | |
| A46 | Camera Scan | DMV Associates handwritten note to Plaintiffs | |
| A47 | Camera Scan | Report of Incident Verification (for forgery) provided by New York State State Trooper | Yes- Private residential address |
| A48 | Screenshot | Email from Ally Financial Inc. to Goodworth | |
| A49 | Screenshot | Secure message in Ally Financial Inc. portal to Goodworth | |
| A50 | Screenshot | USPS Site showing delivery and signature for the demand letter sent to Ally Financial Inc. | |
| A51 | Camera Scan | Down payment receipt for car loan | Yes- Private residential address |

Exhibits

Behind

this Sheet

A1 - A51

# EXHIBIT A1 (PAGE 1 / 3) -
# Certified Luxury Motors' website guarantees on vehicle certification, comprehensive warranty, and a 125 point inspection

certifiedluxurymotors.com/certified-luxury-motors-certified-used-program

## Certification Process

Our certification process keeps you in mind every step of the way. The Certified Luxury Motors CERTIFIED standards apply from the time a Certified Luxury Motors dealer acquires the vehicle through to the final sale. Each candidate for certification can be a current model year vehicle, up to and including six-year-old models, with 85,000 miles or less on the odometer. Prior to the rigorous 125-point inspection, every certified car goes through, a CARFAX vehicle history report is reviewed to ensure that only the best of the best vehicles receive the Certified Luxury Motors Certified Seal of approval.

## 100-Day/3,000-mile Comprehensive Warranty

- 10-year/100,000-mile Limited Powertrain Warranty
- 10 year of Roadside Assistance
- 125-Point Quality Assurance Inspection
- Free CARFAX® Vehicle History Report
- Standard New-Car Financing Rates Available
- Extended Warranty Coverage (items 1, 2, 3 and 4 above) transferable at no cost for added resale value
- Reconditioned to Manufacturer's exacting standards by factory-trained technicians
- Warranty honored at any licensed dealers in the U.S. and Canada
- Trade-ins accepted
- Trouble-free handling of your transaction, including DMV paper work

# EXHIBIT A1 (PAGE 2 / 3)



## 100-Day/3,000-mile Comprehensive Warranty

- 10-year/100,000-mile Limited Powertrain Warranty
- 10 year of Roadside Assistance
- 125-Point Quality Assurance Inspection
- Free CARFAX® Vehicle History Report
- Standard New-Car Financing Rates Available
- Extended Warranty Coverage (items 1, 2, 3 and 4 above) transferable at no cost for added resale value
- Reconditioned to Manufacturer's exacting standards by factory-trained technicians
- Warranty honored at any licensed dealers in the U.S. and Canada
- Trade-ins accepted
- Trouble-free handling of your transaction, including DMV paper work
- All important information clearly spelled out in your contract

Certified Luxury Motors

# EXHIBIT A1 (PAGE 3 / 3)



certifiedluxurymotors.com/certified-luxury-motors-certified-used-program

Trouble-free handling of your transaction, including DMV paper work

All important information clearly spelled out in your contract

## Certified Luxury Motors

**Location**

**Certified Luxury Motors – Great Neck**
215 Northern Blvd
Great Neck, NY 11021

📞 (516) 727-4300

**Quick Links**

View Inventory

Apply now

Privacy Policy

Trade in or sell

About us

**Stay Updated**

Get special offers directly to your inbox.

First    Last

you@email.com

Sign Up

Powered by overfuel.com, the fastest and most reliable mobile-first websites for dealerships.

overfuel

## EXHIBIT A2 (PAGE 1 / 7)
## Cars.com ad which Plaintiffs originally inquired about.



# EXHIBIT A2 (PAGE 2 / 7)



cars.com/vehicledetail/a34c7a08-487b-42d5-b6ed-85e210713827/

✓ Save

## 2021 Mercedes-Benz A-Class A 220

49,310 mi.

## $19,900

Est. $385/mo* ⓘ

⌄ Good Deal | $1,109 under

### Get prequalified

⊘ No impact to your credit score.

⊘ Get an instant, personalized offer with real monthly payments on this car.

⊘ Know your offer before visiting the dealership.

**Get prequalified**

Not all customers will qualify. All decisions related to submission of consumer's credit application, assignment of financing agreement, and available lenders are at sole discretion of the dealer. Cars.com is not an automobile dealer or a lender, and will not render a credit decision.

**Check availability**

By clicking here, you authorize Cars.com and its sellers/partners to contact you by text/calls which may include marketing and be by autodialer. Calls may be prerecorded. You also agree to our Privacy Notice. Consent is not required to purchase goods/services. We value your privacy. **Cars.com Privacy Notice**

### Get prequalified

⊘ No impact to your credit score.

⊘ Get an instant, personalized offer with real monthly payments on this car.

⊘ Know your offer before visiting the dealership.

**Get prequalified**

Not all customers will qualify. All decisions related to submission of consumer's credit application, assignment of financing agreement, and available lenders are at sole discretion of the dealer. Cars.com is not an automobile dealer or a lender, and will not render a credit decision.

Feedback



1:43 PM
2/19/2025

# EXHIBIT A2 (PAGE 3 / 7)

cars.com/vehicledetail/a347a08-487b-42d5-b6ed-85e210713827/

2021 Mercedes-Benz A-Class A 220
$19,900

Check availability

Save

## Basics

Exterior color          Black

Interior color          Black

Drivetrain              All-wheel Drive

MPG                     25–34 ⓘ

Fuel type               Gasoline

Transmission            Automatic

Engine                  Intercooled Turbo Premium Unleaded I-4 2.0
                        L/121

VIN                     W1K5G4FB3MJ300456

Stock #                 VE131-215

Mileage                 49,310 mi.

Feedback

30°F
Partly sunny

Q Search

1:44 PM
2/19/2025

# EXHIBIT A2 (PAGE 4 / 7)

cars.com/vehicledetail/a34c7a08-487b-42d5-b6ed-85e210713827/

2021 Mercedes-Benz A-Class A 220
$19,900

○ Save          Check availability          Feedback

## Features

| | |
|---|---|
| Convenience | Keyless Start |
| | Remote Start |
| Entertainment | Bluetooth® |
| Exterior | Alloy Wheels |
| | Sunroof/Moonroof |
| Safety | Backup Camera |
| | Blind Spot Monitor |
| | Brake Assist |
| | LED Headlights |
| | Stability Control |
| Seating | Memory Seat |

View all features

30°F
Partly sunny

Q Search

1:44 PM
2/19/2025

# EXHIBIT A2 (PAGE 5 / 7)



2021 Mercedes-Benz A-Class A 220
$19,900

## Vehicle history by CARFAX

Free CARFAX 1-Owner Report ↗

| | |
|---|---|
| Accidents or damage | None reported |
| 1-owner vehicle | Yes |
| Personal use only | Yes |

The vehicle history information is supplied by third parties. Cars.com and the Seller are not responsible for the accuracy of such information. Cars.com provides this service and materials without representations or warranties of any kind, either expressed or implied. Please see **Cars.com Terms and Conditions** for further information.

## Seller's info

## Customize your payment

# EXHIBIT A2 (PAGE 6 / 7)



# EXHIBIT A2 (PAGE 7 / 7)



cars.com/vehicledetail/a34c7a08-487b-42d5-b6ed-85e210713827/

**2021 Mercedes-Benz A-Class A 220**
**$19,900**

Welcome to Certified Luxury Motors, located in Great Neck, NY, where quality service and customer satisfaction come first. Our Business motto is simple customer service is our #1 priority and selling quality pre-owned vehicles follows. We are here to help you find a vehicle that fits your lifestyle. All advertised prices exclude sales tax, title and dmv. No additional fees.

Check for recalls ↗

## Have a question?

Get answers, see the car, or find a good time for a test drive. Take the next step and contact the seller.

**Contact seller**

♡ Save

**Check availability**

Length of loan (in months)

36    48    60    72

**Get prequalified**

Not all customers will qualify. All decisions related to submission of consumer's credit application, assignment of financing agreement, and available lenders are at sole discretion of the dealer. Cars.com is not an automobile dealer or a lender, and will not render a credit decision.

*Estimated payments are calculated by Cars.com and are for informational purposes only. We've estimated your taxes based on your provided ZIP code. These estimates do not include title, registration fees, lien fees, or any other fees that may be imposed by a governmental agency in connection with the sale and financing of the vehicle. Other taxes may apply. They do not represent a financing offer or a guarantee of credit from the seller. Actual terms vary by lender.

About your privacy: Cars.com is asking for your ZIP and credit rating because it helps us to make an educated guess at your sales tax and loan interest. These two factors can greatly change your monthly payment.

## EXHIBIT A3
## John Doe #2's handwritten Finance Fee "Breakdown" (on 1/25/25)





**EXHIBIT A4**
**Text messages confirming what was said between Dolce and Jane Doe.**
**(on 1/27/25)**



**EXHIBIT A5 (PAGE 1 / 3)**
**The Headstart Warranty Group packet provided by John Doe #2 (on 1/25/25)**



**EXHIBIT A5 (PAGE 2 / 3)**

## CLAIM PROCEDURE

1. Visit **www.repairpal.com/headstart** to see a list of our trusted RepairPal facilities or return to the Dealer/Seller's onsite Repair Facility.

2. Before any repairs have begun, either the repair facility must call or email the HWG Administrator to open the claim, or you can start the claim online by clicking **File A Claim at headstartwarrantygroup.com.**

3. The repair facility must obtain an authorization number before starting any repair work. The HWG Administrator will not be held responsible for paying for any unauthorized repair invoices.

4. Upon completion of the repair, a complete copy of the repair invoice must be emailed, faxed or mailed to the Administrator for payment. Visit our website for contact information: **headstartwarrantygroup.com.**

5. The repair invoice must contain the following:
   - Complete address for the repair facility
   - Authorization number
   - Repair facility's warranty on repairs (if applicable)
   - Owner name and address
   - Current mileage of vehicle
   - VIN number of vehicle



HWG-VEH-DOC-HLDR-3-24

### ADMINISTRATOR ADDRESS

**HEADSTART WARRANTY GROUP**
14114 North Dallas Pkwy, Suite 600
Dallas, Texas 75254

**CLAIM INQUIRIES**
Phone - 888-964-1899, Option 4
claims@headstartwarrantygroup.com
Fax - 800-811-2660

**ROADSIDE ASSISTANCE: 888-904-2281**

**EXHIBIT A5 (PAGE 3 / 3)**
**Jane Doe's business card stapled to the packet.**



215 Northern Blvd Great Neck, NY 11021

Sales: (516) 727-4300

Website: www.CertifiedLuxuryMotors.com
E-Mail: CertifiedLuxuryMotors@gmail.com

Tatiana

Sales Rep: 646

**EXHIBIT A6**
**Text exchange with Dolce and Jane Doe regarding vehicle issues**
**(on 2/1/25)**



**EXHIBIT A7**
**Text from unknown person regarding bringing vehicle to**
**Certified Luxury Motors (on 2/1/25)**



**EXHIBIT A8 (1 / 3)**
**Text exchange between Dolce and Jane Doe regarding vehicle fuel efficiency dissatisfaction, and a potential trade in (on 2/4/25)**



Tue, Feb 4 at 2:23 PM

Hi Tati, hope you're doing well but quick question. We've been talking and albeit we love this car the only thing is.. it blows for mpg in the city. Like I've had to fill up way more than I'm used to and that's a cost I didn't consider. What're the options if I wanted to trade it in for a different Benz that's similar price/niceness but better city mpg

I could check for you

I'm off today when I go in tomorrow I'll see what I have for you

Thanks girly and lmk if you want to hang tonight Xx

What's your plans??

I'm finishing work in a bit then just waiting for him to get off at 2 am. So nothing much

Maybe we can go get a drink

 iMessage 

**EXHIBIT A8 (2 / 3)**



11:10

‹ 203

T

Tatianna ›

Down

Ok cool so I'll text you in a few

Perfect, and tomorrow look at this stock # for me girly "Stock # VE1131-215"

If the a220 has the ambient lights and heated seats too– I think that's the better option high key. I love this car but it's just not practical for city driving. We'll keep it though if that comparable isn't giving. But I'm thinking long term because really... I'm not gonna sell any car or trade whatever we get. It's a gift from him 🎥 so I have to think long term for sure what makes sense. And this shit.. is EATING GAS

Edited

Ok no problem

Let me take a look at it for you

Yeah it's because it's an amg



**EXHIBIT A8 (3 / 3)**



11:11

**T**

Tatianna

giving. But I'm thinking long term because really... I'm not gonna sell any car or trade whatever we get. It's a gift from him 🍦 so I have to think long term for sure what makes sense. And this shit.. is EATING GAS

Edited

Ok no problem

Let me take a look at it for you

Yeah it's because it's an amg

And god forbid gas prices really go up lmfao that's an extra 100 every week I have to think about

apacity          14 gallons

conomy          25 City / 34 Hwy

Yeah this one's barely getting 19 😂😂😂 and I don't go anywhere but drop him and run errands in the neighborhood 😂😂 but she is a key. I do love the sportiness ngl

**EXHIBIT A9**
**Proof of Dolce's purchase to obtain air machine quarters (on 2/17/25)**



**EXHIBIT A10**
**Picture of tire pressure warning while Dolce was headed towards**
**Goodworth's place of work**



**EXHIBIT A11**
**Goodworth's car insurance roadside assistance claim to tow the vehicle (on 2/18/25) at Grand St / FDR Drive South**



**Confirmation Number**

8841977950000001

COMPLETE

 **Provider Details :**

**A1 TOWING & COLLISION INC**



**Here's some helpful info to revie**

- Unless otherwise noted in you roadside request, please remain with your vehicle until your provider arrives

- Make sure your phone is on ring mode, your provider may call you from an unknown number

- Keep your phone handy and look out for status text updates

- Remove all personal items from your vehicle

- Your confirmation number is: **8841977950000001**

- To contact GEICO Roadside Service directly, call **(800) 424-3426**

📋 **Summary of Request**

**EXHIBIT A12 (1 / 2)**
**Dolce's text to Jane Doe expressing frustration regarding the tire blowout incident that night (on 2/18/25)**



**EXHIBIT A12 (2 / 2)**



far drive south tonight. Not going to lie I'm very pissed- I specifically asked them to check all of the tires because we just got this car and had now 3 mishaps with tires and we literally almost crashed into another car- didn't get a system warning for tire pressure... none of it.   Also they claimed they fixed the air conditioning console the other day and they fucking didn't... I'm exceptionally not happy.

Now we have to tow the car to Darius' garage- with a flat. We need your guy to tow the car to CLM on Long Island and fix the tires and fix everything going wrong with the car asap. This isn't appropriate- I know it's not your fault but it seems they were skimping out and trying to evade doing shit. And I let stuff slide until it literally puts my partner and I in danger at night on the most dangerous highway in the city.

Definitely not cool. Please call me as soon as you wake up and see this. It's literally an emergency

**EXHIBIT A13 (1 / 5)**
**Photo of tow truck driver's arrival, Goodworth conversing with the individual.**



**EXHIBIT A13 (2 / 5)**



**EXHIBIT A13 (3 / 5)**



**EXHIBIT A13 (4 / 5)**
Tow truck driver and Goodworth prepping the car to get hooked.



**EXHIBIT A13 (5 / 5)**



**EXHIBIT A14 ( 1 / 2 )**
**Dolce and Jane Doe's text exchange post their initial phone conversation**
**with an agreement to tow the vehicle for repairs (on 2/18/25)**



**EXHIBIT A14 (2 / 2 )**



3/8/25, 9:34 AM                                    Gmail - To Owner/Executive of Certified Luxury Motors

**Exhibit A15 ( 1 / 2 )**

 Gmail                                                              Persephone D ▮▮▮▮▮▮▮▮▮▮

## To Owner/Executive of Certified Luxury Motors

1 message

**Persephone D** <▮▮▮▮▮▮▮▮▮▮                                              Tue, Feb 18, 2025 at 1:10 PM
To: "Certifiedluxurymotors@gmail.com" <Certifiedluxurymotors@gmail.com>
Cc: Darius Goodworth <▮▮▮▮▮▮▮▮▮▮

2/18/2025

**Certified Luxury Motors**
215 Northern Blvd
Great Neck, NY 11021

**Subject: Final Demand for Resolution – Legal Action Pending in Supreme Court of Nassau County**

To Whom It May Concern,

This letter serves as **formal notice of my intent to initiate legal action in the Supreme Court of Nassau County** against Certified Luxury Motors ("the Dealership") for **fraudulent misrepresentation, deceptive business practices, breach of warranty, and gross negligence** in the sale of a **dangerous, improperly inspected vehicle** that put my life at risk.

On **1/25/2025**, I purchased a 2021, **Mercedes Benz, A35-AMG, VIN: W1K3G5BBXMJ278513 , Stock #: VE1100-SR** from your dealership. You explicitly advertised that your vehicles undergo a **"125-Point Quality Assurance Inspection"**, are **"Reconditioned to Manufacturer's exacting standards by factory-trained technicians,"** and include a **"100-Day/3,000-Mile Comprehensive Warranty."** These claims induced me to purchase the vehicle under the belief that it had been thoroughly inspected, safe to drive, and free from major defects.

However, within **days of purchase**, the vehicle suffered **multiple critical failures**, proving that your representations were false.

On **February 18, 2025, on a recorded call-** I spoke with **Tatianna** who ensured she'd get the manager to pick up the vehicle from my partner's garage located at **123 Linden Blvd, Brooklyn, NY, 11226** and would make the necessary fixes as she confirmed it was indeed a safety issue.

I got a call back from Tatianna who then put **Vincent**, the manager at Certified Luxury Motors, regarding the ongoing issues with my vehicle. Instead of addressing the clear defects in the tires and heating system, Vincent dismissed my concerns and pushed back on performing the necessary repairs, despite the dealership's advertised warranties and inspection guarantees. When I insisted that these were pre-existing issues, he insulted me as the customer, stating that it was "not his fault I don't know how to use the car" and condescendingly suggested that I bring it in so they could teach me how to use it—completely ignoring the mechanical defects that should have been addressed before the sale.

## Serious Safety Hazards & Fraudulent Misrepresentation:

1. **Defective Tires – A Life-Threatening Safety Risk**
   - **Rear tire developed a leak the same day of purchase.** Attendant's of the dealership took the car across the street to the gas station to fill the **back right** tire with air. Upon returning the attendant assured us that "the tire is fine, just needed to be filled because it's been sitting in the showroom."
   - **Just days after purchase**, this same tire required immediate replacement because there was a leak present.
   - **On 2/18/25 at approximately 2:30AM, The Front left tire gave a tire pressure warning of about "18", literally 7 seconds later- it blew out while my partner was driving on the FDR Drive-Highway in Lower Manhattan**, creating a significant danger to my life and others in the car and people on the road. The car's wheel had locked towards the right and almost crashed into the highway guardrail. We had to immediately slow down and veer off the highway onto Grand Street, and FDR Drive South. The car was towed to 123 Linden Blvd, Brooklyn, NY- my partner's current storage garage for the vehicle.
   - **A proper 125-Point Inspection should have identified these tire defects before the sale. Two tire incidents in less than 30 days is not indicative of an adequate 125 point inspection.**

Case 1:25-cv-02150-AT-RWL    Document 1    Filed 03/14/25    Page 129 of 153

**Exhibit A15 ( 2 / 2 )**

2. **Non-Functioning Heating System – Further Proof of False Inspection Claims**

- The **front console and rear console heating vents do not function**, a defect that should have been detected and repaired under your **"Manufacturer's Standards" reconditioning claim on your website.**

These failures occurred within 30 days of purchase, contradicting your warranty protections and proving that your inspection was either fraudulent, grossly negligent, or never performed at all.

## Legal Violations & Liability Under New York Law

If Certified Luxury Motors refuses to immediately correct these defects, I will proceed with **legal action in the Supreme Court of Nassau County**, seeking damages for:

- **Fraudulent Misrepresentation** – Selling an unsafe vehicle under the false claim of a thorough manufacturer-standard inspection.
- **Deceptive Trade Practices (New York GBL § 349)** – Engaging in misleading business practices to induce consumers into purchasing defective vehicles.
- **Breach of Express & Implied Warranties** – Failing to honor the **100-Day/3,000-Mile Warranty** and failing to provide a vehicle fit for ordinary use.
- **Gross Negligence & Endangerment** – Knowingly selling a car with dangerous defects, leading to a **life-threatening tire blowout on a high-speed roadway.**
- **New York Used Car Lemon Law Violation (NY GBL § 198-b)** – Selling a defective used vehicle without disclosing or repairing critical safety defects.

Additionally, I will be filing **formal complaints** with the following agencies:

- New York Attorney General – Consumer Frauds Bureau
- New York DMV – Dealer Investigations Division
- Better Business Bureau (BBB) & Online Consumer Protection Agencies
- National Highway Traffic Safety Administration (NHTSA) – Vehicle Safety Complaint

## Resolution Demands – Deadline: 2/21/25

To avoid further legal action, I demand that Certified Luxury Motors:

1. **Replace the front left tire and inspect/replace all other tires** at no cost.
2. **Repair the non-functioning heating system** at no cost.
3. **Provide a copy of the 125-Point Inspection Report** allegedly performed before sale.
4. **Provide a copy of proof that the back right tire** was replaced as guaranteed the week of February 1.
5. **Provide a written response detailing whether you intend to honor your warranty and safety guarantee commitments.**

If I do not receive a **satisfactory resolution by Friday**, I will **immediately initiate a lawsuit in the Supreme Court of Nassau County** and aggressively pursue damages for fraud, negligence, and deceptive business practices. You will receive a petition on Monday February 24, 2025- please take heed of this. This is not an idle threat, it is a **guarantee** given the seriousness of the matter-and the utter disregard for the safety of myself, my partner and other drivers that your manager "Vincent" has displayed.

This is **your final opportunity to resolve this matter amicably**. I strongly urge you to fulfill your legal and ethical obligations before this escalates further. Fixing tires and ensuring the safety of your customers  after they purchased a vehicle from you **not more than 30 days ago** should be paramount and apparent.

Take note that you will receive a copy of this letter via certified mail.

Sincerely,
**Persephone Dolce**
P████████████.com
████████

# EXHIBIT A16 ( 1 / 3 )

Certified Luxury Motors website advertisement of Plaintiffs' vehicle and the corresponding vehicle specs.





# EXHIBIT A16 ( 2 / 3 )



certifiedluxurymotors.com/inventory/inventory/2021-mercedes-benz-a-class-amg-a-35-W1K3G5BBXMJ278513

## VEHICLE DETAILS

| | | | |
|---|---|---|---|
| Condition | Pre-owned | Fuel Type | Gasoline |
| Body Type | Unknown | Fuel Capacity | 14 gallons |
| Trim | AMG A 35 | Fuel Economy | 22 City / 29 Hwy |
| Series | AMG A 35 4MATIC Sedan | Transmission | 7-Speed Auto-Shift Manual w/OD |
| Exterior Color | ● Gray | Engine | Intercooled Turbo Premium Unleaded I-4 2.0 L/121 |
| Interior Color | ● Gray | Dimensions | 78.4" w x 179.4" l x 56.9" h |
| VIN | W1K3G5BBXMJ278513 | Wheelbase | 107.4" |
| Stock # | VE1100-SR | Front Wheel | 18.0 x 8.0 |
| Passengers | 5 | Rear Wheel | 18.0 x 8.0 |
| Drivetrain | AWD | Front Tire | 235/40R18 |
| Horsepower | 302 hp @ 5800 RPM | Rear Tire | 235/40R18 |
| Torque | 295 lb-ft @ 3000 RPM | | |

View Window Sticker

● Certified Luxury Motors - Great Neck

## SOLD

This one got away, but we have many more to choose from!

**Browse All Inventory**

View Similar Inventory

**What's your car worth?**
Get your trade-in value

# EXHIBIT A16 ( 3 / 3 )



certifiedluxurymotors.com/inventory/2021-mercedes-benz-a-class-amg-a-35-W1K3G5BBXMJ278513

**KEY FEATURES**

Android Auto

Backup camera

Collision warning

Apple CarPlay

Blind spot monitor

Lane departure warning

Automatic climate control

Bluetooth

Memory seats

Show all 14 features ∨

**DEALER NOTES**

All pricing and details on this website are believed to be accurate, but we do not warrant or guarantee such accuracy. Please call or email us for complete vehicle-specific information. All displayed inventory is subject to prior sale, and all prices expire at midnight on the date displayed. Every reasonable effort has been made to ensure the accuracy of the information on this site; however, absolute accuracy cannot be guaranteed. Advertised specials exclude state tax, city tax, license, registration, NY state inspection, NYS tire recycling fee, finance charges, reconditioning fees and applicable dealer fees. All online prices are a balance after putting $3995 down. Special pricing ad/promotion is available to customers who reference such pricing present the ad at time of sale otherwise in store list price applies. Buyer is responsible to verify options/packages. Any error voids the ad. Certified Pre-Owned program available. Please verify any information in question with a dealership sales manager, which can be done by calling us at 516-727-4300 or visiting our dealership.

◆ Certified Luxury Motors - Great Neck

**SOLD**

This one got away, but we have many more to choose from!

Browse All Inventory

View Similar Inventory

**What's your car worth?**
Get your trade-in value

**EXHIBIT A17 ( 1 / 6 )**
**Photos of first time seeing Left Front tire rims**
**damage/cracks/warping (on 2/18/25)**



EXHIBIT A17 ( 2 / 6 )



**EXHIBIT A17 ( 3 / 6 )**



**EXHIBIT A17 ( 4 / 6 )**



**EXHIBIT A17 ( 5 / 6 )**



# EXHIBIT A17 ( 6 / 6 )



**EXHIBIT A18**
Call log proof of conversation with Mercedes Benz Manhattan Location.



February 19, 2025

3:42 PM   **Outgoing Call**
27 minutes

Share Contact

Create New Contact

Add to Existing Contact

Add to Emergency Contacts

Block Caller

 Favorites    Recents    Contacts    Keypad    Voicemail

**EXHIBIT A19 ( 1 / 2 )**
**Financing paperwork shown by John Doe #2  (on 1/25/25 and 2/20/25)**

# 1ST TIME BUYER AUTO LOAN PROGRAM
## Step By Step Tier A Credit
## PRE-OWNED VEHICLES

**Interest RATE: 10.79%**                    **Interest Rate: %**
**Min: $ 2000**

Includes:

\_\_/Rate For Life of Loan (Rate Buy down)        Rate For Life of Loan
\_\_/No Pre-Payment Penalty                        Pre-Payment Penalty

\_\_/Down Payment Reimbursement (Up to $15,000)
\_\_/Anti-Theft Package (VIN Etching)
\_\_/Discount on Vehicle's Insurance (Up To 10%)
\_\_/ 36 MTH & 60 k bumper to bumper warranty

**MONTHLY PAYMENT**                        **MONTHLY PAYMENT**

**BIWEEKLY ($426.21)**
**Monthly ($852.42)**                          $

_____        _____
Signature                                Signature

Our decision was based on information collected from the various credit reporting agencies. (Experian, Trans Union, Equifax)  For information on your credit profile please contact the various credit reporting agencies. (Experian, Trans Union, Equifax)

# EXHIBIT A19 ( 2 / 2 )
## Financing application shown by John Doe #2 (on 1/25/25 and 2/20/25)

**CREDIT APPLICATION**

NAME _Darius_ _Lloyd_ _Goodworth_
     FIRST NAME    MIDDLE NAME    LAST NAME    SUFFIX

HOME TELEPHONE ( ▮ )    CELL PHONE NUMBER ( ▮ ) ▮▮▮▮

EMAIL ADDRESS _Darius.Goodworth@gmail.com_

DATE OF BIRTH _10, 20, 84_   SOCIAL SECURITY # ▮▮▮▮   ☑ SINGLE   ☐ MARRIED

HOME ADDRESS ▮▮▮▮ _NY 14752_ YEARS _3/0_ MOS
            NUMBER   STREET NAME   APT#   CITY   STATE   ZIP

OWN   RENTING   MORTGAGE   (OTHER)    AMOUNT $ _0_   / MONTHLY

IF LESS THAN 2 YEARS AT PRESENT HOME ADDRESS MUST HAVE PREVIOUS HOME ADDRESS
PREVIOUS ADDRESS _____ YEARS ____ MOS ____
               NUMBER   STREET NAME   APT#   CITY   STATE   ZIP

EMPLOYER ▮▮▮▮    TELEPHONE ( ▮ )

EMPLOYER ADDRESS ▮▮▮▮
               NUMBER   STREET NAME   FLR#   CITY   STATE   ZIP   SUITE#

POSITION _Travel Nurse_ YEARS _2_ MOS ___ GROSS INCOME YEARLY / (WEEKLY) $ _3005_

1ᴿᴰ INCOME/EMPLOYER _____ TELEPHONE ( ___ ) ___ EXT ___

2ᴺᴰ EMPLOYER ADDRESS _____ YEARS ___ MOS ___

POSITION _____ GROSS YEARLY INCOME $ _____

IF LESS THAN 2 YEARS AT PRESENT EMPLOYER MUST HAVE PREVIOUS EMPLOYER
PREVIOUS EMPLOYER _____ TELEPHONE ( ___ ) ___ EXT ___
ADDRESS _____ POSITION ___ YEARS ___ MOS ___
NUMBER   STREET NAME   FLR#   CITY   STATE   ZIP

## CAR INFORMATION AND DEAL STRUCTURE

YEAR _21_ MAKE _Mercedes_ MODEL _Benz_ MILES _67,061_ VIN# _W1K3G5BBXMJ278513_

1. SELLING PRICE BEFORE PROCESSING, TAX, DMV    DG  $ _31,180_

2. TOTAL DOWN PAYMENT    DG  $ _2,000_

3. TOTAL TRADE ALLOWANCE    $ _N/A_
   YEAR: _N/A_  MAKE: _N/A_  MODEL: _N/A_

4. TRADE-IN PAY OFF IF ANY    $ _N/A_

NOTE: All deposit are fully refundable, if not approved. 10% cancellation fee will be charged, on amount financed, on any approve deals.

DURING THE REVIEW OF MY APPLICATION YOU, A BANK AND/OR A FINANCE COMPANY MAY OBTAIN A CONSUMER CREDIT REPORT FOR THE PURPOSE OF SECURING CREDIT FROM YOU IN CONNECTION WITH THIS PURCHASE BY ME OF THE MOTOR VEHICLE MENTIONED HEREON AND TO INDUCE A BANK OR A FINANCE COMPANY TO PURCHASE THE RETAIL INSTALLMENT CONTRACT, YOU, A BANK AND/OR A FINANCE COMPANY MAY CONTACT THE EMPLOYERS LISTED ABOVE TO OBTAIN VERIFICATION OF MY EMPLOYMENT, INCOME AND OTHER PERTINENT INFORMATION CONTAINED IN THIS CREDIT APPLICATION, THE UNDERSIGNED MAKES THE FOLLOWING REPRESENTATIONS AS TRUE AND CORRECT AND UPON WHICH YOU CAN RELY.

X _____    DATE: _01_ / _25_ / _2025_    VE1100
CUSTOMER'S SIGNATURE


Scanned with CamScanner

**EXHIBIT A20 ( 1 / 2 )**
**Business card provided by John Doe #2  (on 2/20/25)**



**EXHIBIT A20 ( 2 / 2)**



215 Northern Blvd Great Neck, NY 11021

Sales: (516) 727-4300

Website: www.CertifiedLuxuryMotors.com

E-Mail: CertifiedLuxuryMotors@gmail.com

Sales Rep:

# EXHIBIT A21
# New York State Safety and Emissions Vehicle Inspection Report provided by John Doe #1 (on 2/20/25)



**NYVIP** State of New York Vehicle Inspection Program

**STATE OF NEW YORK**

**VEHICLE INSPECTION REPORT**

Page 1/1

**OPUS**

Print Date: 1/11/2025 10:19:30 AM    Inspection Date: 1/11/2025 10:12:28 AM    Expiration Date: 01/31/2026    Inspection Type: Initial Inspection   Version 24.01.04

| VEHICLE DETAILS | VIN | W1K3G3GBXMJ278513 | MODEL | A-Class | FUEL | 0 |
|---|---|---|---|---|---|---|
| | YEAR | 2021 | PLATE | DEALER | WEIGHT | 0 - 8500 lbs |
| | MAKE | Mercedes-Benz | MILEAGE | 67,047 | EIR # | 655848 |

| INSPECTION SUMMARY | Inspection Result | Safety | Emission | Certificate Number | Fee |
|---|---|---|---|---|---|
| | PASS | PASS | PASS | IN: 0853400044 | $37.00 |

Congratulations, your vehicle has passed its annual New York State inspection. Please retain this receipt for your records. You may be required to present this receipt in order to renew your vehicle registration.

Wheel Removed: L/F, R/F, L/R, R/R

** The Result of the inspection will be transmitted electronically to DMV, usually within 24 hours.

Recall Advisory Notice Any recall information included in this report is based on information supplied to the New York Vehicle Inspection Program at the time of inspection. The program depends on its sources for the accuracy and reliability of its information. Therefore, no responsibility is assumed by NY DMV or its agents for errors or omissions in this report. To check for vehicle recalls, go to NHTSA.gov/recalls and enter your vehicle's VIN (vehicle identification number). NHTSA.gov/recalls will quickly tell you if your vehicle has not been repaired as part of a safety recall in the last 15 years. In case of an open recall, you may visit a local new car dealer who sells and repairs your brand of vehicle to have it repaired at no expense.

VEHICLE INSPECTION QUESTIONS:
For additional information please contact the Department of Motor Vehicles at website address: http://www.dmv.ny.gov.
Or by telephone number: 212-645-5550 or 718-966-6155.

| FACILITY INFO | Inspector Number | NYVIP Record Number | Online/Offline | DMV Record Match |
|---|---|---|---|---|
| | YB49 | 1941 | Online | V |
| | Facility Number | Facility Name | Facility Phone Number | Analyzer Number |
| | 7098670 | NORTH SIDE CAR CARE | 718746952) | NY30008534 |
| | Address | 145 NORTHERN BLVD, GREAT NECK | | Name/RO#: |

Scanned with CamScanner

# EXHIBIT A22
## Proof of Dolce's purchase in order to receive quarters for the tire air machine

```
Welcome to Shell
     57544416209
  SHELL
     1855 FIRST AVE
  NEW YORK    NY  10128


  <CUSTOMER COPY>

  Description        Qty      Amount
  -----------        ---      ------
    Tropicana 100% Stra   1     2.50
  T Reeses-king Size Cr   1     2.30
    Groc Non Tax          1     2.00
                                -----------
                    Subtotal    6.80
                         Tax    0.20
                       TOTAL    7.00
                   CREDIT  $    7.00

  AMEX CREDIT           USD$7.00
  XXXX XXXXXX X
  Contactless
  APPROVED
  AUTH # 885484       INV # 543470

  Mode: Issuer
  AID: A000000025010901
  TVR: 0010008000
  IAD: 06030103A20102
  TSI: E800
  ARC: 00


           Customer Copy



        Please come again

  ST#AB123        DR#1 TRAN#1014494
  CSH: 3          2/21/25 2:21:59 AM
```

**EXHIBIT A23 ( 1 / 2 )**
**Proof of Dolce's mailing of the letter to Ally Financial Inc.'s headquarters.**



# EXHIBIT A23 ( 2 / 4 )
# The letter mailed to Ally Financial Inc.

Darius Goodworth



NY, 14752

.com

**2/20/25**

Ally Financial, Inc.
Auto Loan Servicing Department
500 Woodward Ave, Detroit, MI 48226

Subject: Formal Demand to Freeze Loan Payments & Investigate Dealer Fraud

Account Number: 228-4338-02248
Vehicle Information: 2021 Mercedes-Benz AMG A35 (VIN: W1K3G5BBXMJ278513)
Dealer: Certified Luxury Motors (215 Northern Blvd, Great Neck, NY 11021)

To Whom It May Concern,

I am writing to formally demand an immediate freeze on loan payments and an internal investigation into Certified Luxury Motors due to loan fraud, fraudulent misrepresentations and deceptive lending practices related to my vehicle purchase.

On January 25, 2025, I purchased the above-mentioned vehicle from Certified Luxury Motors, which falsely advertised:

- A 125-point inspection and certification to manufacturer standards (which was proven false).
- A 100-day/3,000-mile comprehensive warranty and 10-year/100,000-mile powertrain warranty (which cannot be found by the company they provided us).
- The vehicle price as $23,990, yet I was charged $38,879.20 with undisclosed fees.

Additionally, the dealership:

- Falsely claimed the loan would not be funded until 30 days later (when in reality, Ally Financial confirmed over the phone on 2/20/25 that it funded the loan the same day).
- Provided an incorrect date on the down payment receipt (December 31, 2024, instead of January 25, 2025), raising concerns of fraudulent financial and tax reporting.
- Failed to complete the loan information by: **providing the address of Ally Financial, the website, contact information,** and **how and where to pay the loan,** which is pertinent information required by law in the contract.
- Failed to disclose that the tires and rims were dangerously defective, leading to a catastrophic tire blowout on the FDR in Manhattan—putting 3 people, including my own life, at risk.

# EXHIBIT A23 ( 3 / 4 )
# The letter mailed to Ally Financial Inc.

- Failed to provide copies of a reported replaced back right tire
- Failed to provide copies of a 125 Point inspection report.

Ally's Legal Liability & Violations

Since I have provided clear evidence of fraudulent misrepresentation, deceptive pricing, and potential business record falsification, Ally Financial now has legal exposure under multiple laws:

1. Truth in Lending Act (TILA) (15 U.S.C. § 1601 et seq.)
   o Ally Financial funded a loan tied to undisclosed fees and deceptive lending practices, violating TILA's disclosure requirements.
2. New York General Business Law § 349 – Deceptive Acts & Practices
   o If Ally knowingly enforces a fraudulent loan, it becomes complicit in consumer fraud.
3. Unjust Enrichment – Profiting from a Fraudulent Sale
   o If Ally continues to enforce payments on a contract obtained through deception, it is unjustly enriching itself.
4. Aiding & Abetting Fraud (NY Penal Law § 190.65 – Scheme to Defraud)
   o If Ally refuses to investigate despite knowing the dealership engaged in fraud, it could be liable for aiding a fraudulent scheme.

Immediate Demands

I am demanding that Ally Financial:

- Immediately freeze all loan payments while fraud allegations are investigated.
- Freeze **ALL** credit reporting to the bureaus.
- Do not attempt to repossess, boot, or tow the car.
- Do not start any collection actions or lawsuits.
- Conduct an internal review of Certified Luxury Motors' fraudulent lending practices.
- Provide full loan details, including a breakdown of disbursed funds and dealer fees.
- How the interest rate was calculated and offered by Ally Financial and the Dealership.
- How the loan was approved and what documentation you all received.
- Confirm in writing whether Ally Financial was aware of the dealer's deceptive pricing, statements and warranty fraud.
- When Fraud is determined, full cancellation of the loan with full-liability for the loan disbursed amount going to the dealership **ONLY**.

### Failure to Act Will Result in Legal Action

If Ally Financial fails to comply with this demand, I will take the following actions:

## EXHIBIT A23 ( 4 / 4 )
## The letter mailed to Ally Financial Inc.

- File a formal complaint with the Consumer Financial Protection Bureau (CFPB) against Ally Financial for enforcing a fraudulent loan.
- Report Ally Financial to the New York State Attorney General for potential consumer fraud violations.
- Add Ally Financial as a defendant to the pending Supreme Court of New York-Nassau County Case against the dealership for fraudulent lending, TILA violations, unjust enrichment, and aiding and abetting.

I expect a written response within 7 business days from the received date of this letter. Failure to respond will be taken as an admission of guilt, as with the dealership. I will escalate legal action if so. This letter will be sent via certified mail so the date and time of receipt can be confirmed and noted for court records.

Sincerely,

Darius Goodworth

████████████████

████████████████.com

# EXHIBIT A24 ( 1 / 4 )
## Original purchase contract Goodworth signed (on 1/25/25)

LAW 553-NY-eps-14 9/24

**RETAIL INSTALMENT CONTRACT**
**SIMPLE FINANCE CHARGE**

DEAL# 3391
CUST# 10481

CERT# 0001428

| Buyer Name and Address (including County and Zip Code) | Co-Buyer Name and Address (including County and Zip Code) | Seller-Creditor (Name and Address) |
|---|---|---|
| DARIUS L GOODWORTH | N/A | CERTIFIED LUXURY MOTORS |
| NY 14769 | | 106 NORTHERN BLVD |
| COUNTY: CHAUTAUQUA | | GREAT NECK NY 11021 |
| Cell: N/A | Cell: N/A | 616-727-4600 |
| Email: N/A | Email: N/A | |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements in this contract. You agree to pay the Seller - Creditor (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge in U.S. funds according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-In-Lending Disclosures below are part of this contract.

| New/Used/Demo | Year | Make and Model | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|
| USED | 2021 | MERCEDES A35AMG | W1K3G5BBXMJ278513 | Personal, family, or household unless otherwise indicated below □ business □ agricultural _____ N/A |

### FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your down payment of $2000.00 is |
|---|---|---|---|---|
| 10.79 % | $ 13747.20 | $ 37279.20 | $ 61026.40 | $ 63026.40 |

**Your Payment Schedule Will Be:** (e) means an estimate

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 72 | $ 708.70 | MONTHLY   beginning 03/11/2025 |
| N/A | $ N/A | N/A |
| | | N/A |

**Late Charge.** If payment is not received in full within ___10___ days after it is due, you will pay a late charge of $ __1.00__ or __6__ % of the part of the payment that is late, whichever is ___greater___.
**Prepayment.** If you pay early, you will not have to pay a penalty.
**Security Interest.** You are giving a security interest in the vehicle being purchased.
**Additional Information:** See this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date and security interest.

**GAP Waiver Notice**
□ If this box is checked, and if the vehicle is a total loss because it is confiscated, damaged, or stolen, you will not be liable for the gap amount. The gap amount is the excess, if any, of (1) the amount you would owe under this contract as of the date of loss if the vehicle were not a total loss and you were to prepay the contract in full (less any refunds we get for cancelling optional insurance, maintenance, service or other contracts), over (2) the sum of (a) any past due payments and other amounts due because you broke promises in this contract and (b) the actual cash value of the vehicle immediately before the loss.

**Trade-In Payoff Agreement:** Seller relied on information from you and/or the lienholder or lessor of your trade-in vehicle to arrive at the payoff amount shown in item 2 of the Itemization of Amount Financed as the "Payoff Made by Seller." You understand that the amount quoted is an estimate.
If the actual payoff amount is more than the amount shown in 2 you must pay the Seller the excess on demand. If the actual payoff amount is less than the amount shown in 2 Seller will refund to you any overage Seller receives from your prior lienholder or lessor.

Buyer Signature X ___N/A___
Co-Buyer Signature X ___N/A___

**WARRANTIES**
The following paragraph does not affect any warranties covering the vehicle that the manufacturer may provide or limit any rights you may have under the Lemon Laws or, for used vehicles, under the certificate of serviceability that was included in your purchase contract. The following paragraph also does not apply if the vehicle is a used vehicle you bought in New York City.
Unless the Seller makes a written warranty or enters into a service contract within 90 days of the date of this contract, the Seller makes no warranties on the vehicle. Making no warranties means that you get no express warranties, and no implied warranties of merchantability or fitness for a particular purpose.
The following notice only applies to used vehicles bought in New York City.
**NYC DEPARTMENT OF CONSUMER AND WORKER PROTECTION LICENSE NO.** ___N/A___ , **IF YOU HAVE A COMPLAINT ABOUT THIS BUSINESS VISIT NYC.GOV/DCWP OR CONTACT 311.**

**NO COOLING OFF PERIOD UNLESS YOU HAVE A CONTRACT CANCELLATION OPTION**
State law does not provide for a "cooling off" or cancellation period for this sale. After you sign this contract, you may only cancel it if the seller agrees or for legal cause. You cannot cancel this contract simply because you change your mind. This notice does not apply to home solicitation sales. It also does not apply if you buy a used vehicle from a Seller-Creditor located in New York City and you did not decline your option to cancel. The laws of New York City provide a two-day cancellation option if you buy a used vehicle. This cancellation option is subject to certain conditions. See the NYC Used Car Contract Cancellation Option agreement for details.

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

The preceding NOTICE applies only to goods or services obtained primarily for personal, family, or household use. In all other cases, Buyer will not assert against any subsequent holder or assignee of this contract any claims or defenses the Buyer (debtor) may have against the Seller, or against the manufacturer of the vehicle or equipment obtained under this contract.

112288*1*CLM-F)                    01/25/2025  08:49 pm

Buyer Initials X _____ Co-Buyer Initials X _N/A_        LAW 553-NY-eps-14 9/24 v1  Page 1 of 4


Scanned with CamScanner

# EXHIBIT A24 ( 2 / 4 )

LOAN XXXX

**ITEMIZATION OF AMOUNT FINANCED**

1 Cash Price (including $ ____ 2877.20, sales tax) ......................... $ ____ 35879.20 (1)

2 Total Downpayment =
Your trade-in is a ____ N/A ____ N/A ____ N/A ____ N/A
       Year     Make    Model   Vehicle Identification No.

  Gross Trade-In Allowance ............................................. $ ____ N/A
  Less Payoff Made By Seller to .. N/A _____ (e) $ ____ N/A
  Equals Net Trade In ................................................. $ ____ N/A
  + Cash ............................................................. $ ____ 2000.00
  + Other N/A ........................................................ $ ____ N/A
  + Other N/A ........................................................ $ ____ N/A
  + Other N/A ........................................................ $ ____ N/A
  (if total downpayment is negative, enter "0" and see 4I below) $ ____ 2000.00 (2)

3 Unpaid Balance of Cash Price (1 minus 2) ........................... $ ____ 35879.20 (3)

4 Other Charges including Amounts Paid to Others on Your Behalf
  (Seller may keep part of these amounts):
  A Cost of Optional Credit Insurance Paid to Insurance Company or Companies
    Life ........................................ $ ____ N/A
    Disability ................................. $ ____ N/A ____ $ ____ N/A
  B Vendor's Single Interest Insurance Paid to Insurance Company $ ____ N/A
  C Other Optional Insurance Paid to Insurance Company or Companies $ ____ N/A
  D Official Fees Paid to Government Agencies
    to N/A _____ for N/A ................. $ ____ N/A
    to N/A _____ for N/A ................. $ ____ N/A
    to N/A _____ for N/A ................. $ ____ N/A
  E Government Taxes Not Included in Cash Price $ ____ N/A
  F Government License and/or Registration Fees
    N/A
    REGISTRATION FEE ............................ $ ____ 225.00
  G Government Certificate of Title Fees ........ $ ____ N/A
  H Government Waste Tire Management Fee ........ $ ____ N/A
  I Other Charges (Seller must identify who is paid and describe purpose)
    to N/A _____ for Prior Credit or Lease Balance (e) $ ____ N/A
    to N/A _____ for N/A ................. $ ____ N/A
    to N/A _____ for N/A ................. $ ____ 175.00
    to CERTIFIED LUXURY MOTORS for DOCUMENTATION FEE $ ____ N/A
    to N/A _____ for N/A ................. $ ____ N/A
    to N/A _____ for N/A ................. $ ____ N/A
    to N/A _____ for N/A ................. $ ____ N/A
    to N/A _____ for N/A ................. $ ____ N/A
    to N/A _____ for N/A ................. $ ____ N/A
    to N/A _____ for N/A ................. $ ____ N/A
  Total Other Charges and Amounts Paid to Others on Your Behalf $ ____ 400.00 (4)

5 Amount Financed (3 + 4) ............................................. $ ____ 37279.20 (5)

**OPTION:** ☐ You pay no finance charge if the Amount Financed, item 5, is paid in full on or before
____ N/A ____ , Year ____ N/A ____ . SELLER'S INITIALS ____ N/A

☐ **VENDOR'S SINGLE INTEREST INSURANCE (VSI Insurance):** If this preceding box is checked, the Creditor requires VSI Insurance for the initial term of the contract to protect the Creditor for loss or damage to the vehicle (collision, fire, theft, concealment, skip). VSI Insurance is for the Creditor's sole protection. This insurance does not protect your interest in the vehicle. You may choose the Insurance company through which the VSI Insurance is obtained. If you elect to purchase VSI Insurance through the Creditor, the cost of this insurance is $ ____ N/A ____ and is also shown in item 4B of the Itemization of Amount Financed. The coverage is for the initial term of the contract.

**Returned Check Charge:** You agree to pay a charge of $ ____ 20 ____ if any check you give us is dishonored.

---

Insurance. You may buy the physical damage insurance this contract requires from anyone you choose who is acceptable to us. You may also provide the physical damage insurance through an existing policy owned or controlled by you that is acceptable to us. You are not required to buy any other insurance to obtain credit unless the box indicating Vendor's Single Interest Insurance is required is checked below.

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

Check the insurance you want and sign below:

## Optional Credit Insurance

☐ Credit Life: ☐ Buyer ☐ Co-Buyer ☐ Both
☐ Credit Disability: ☐ Buyer ☐ Co-Buyer ☐ Both

Premium:
Credit Life $ ____ N/A
Credit Disability $ ____ N/A
Insurance Company Name ____ N/A
N/A
Home Office Address ____ N/A
N/A

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not buy credit life insurance and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. If you choose this insurance, the cost is shown in item 4A of the Itemization of Amount Financed. Credit life insurance is based on your original payment schedule. This insurance may not pay all you owe on this contract if you make late payments. Credit disability insurance does not cover any increase in your payment or in the number of payments. Coverage for credit life insurance and credit disability insurance ends on the original due date for the last payment unless a different term for the insurance is shown below.

### Other Optional Insurance

☐ ____ N/A
   Type of Insurance ____ Term
Premium $ ____ N/A
Insurance Company Name ____ N/A
N/A
Home Office Address ____ N/A
N/A

☐ ____ N/A
   Type of Insurance ____ Term
Premium $ ____ N/A
Insurance Company Name ____ N/A
N/A
Home Office Address ____ N/A
N/A

Other optional insurance is not required to obtain credit. Your decision to buy or not buy other optional insurance will not be a factor in the credit approval process. It will not be provided unless you sign and agree to pay the extra cost. I want the insurance checked above.

X ____ N/A _____ ____
   Buyer Signature          Date

X ____ N/A _____ ____
   Co-Buyer Signature       Date

**THIS INSURANCE DOES NOT INCLUDE INSURANCE ON YOUR LIABILITY FOR BODILY INJURY OR PROPERTY DAMAGE CAUSED TO OTHERS.**

Co-Buyer Initials X N/A

Scanned with CamScanner

# EXHIBIT A24 ( 3 / 4 )

OTHER IMPORTANT AGREEMENTS                                    DEALS 2321

## 1. FINANCE CHARGE AND PAYMENTS

**a.** How we will figure Finance Charge. We will figure the Finance Charge on a daily basis at the Annual Percentage Rate on the unpaid part of the Amount Financed.

**b.** How we will apply payments. We may apply each payment to the earned and unpaid part of the Finance Charge, to the unpaid part of the Amount Financed and to other amounts you owe under this contract in any order we choose as the law allows.

**c.** How late payments or early payments change what you must pay. We based the Finance Charge, Total of Payments, and Total Sale Price shown on page 1 of this contract on the assumption that you will make every payment on the day it is due. Your Finance Charge, Total of Payments, and Total Sale Price will be more if you pay late and less if you pay early. Changes may take the form of a larger or smaller final payment or, at our option, more or fewer payments of the same amount as your scheduled payment with a smaller final payment. We will send you a notice telling you about these changes before the final scheduled payment is due.

**d.** You may prepay. You may prepay all or part of the unpaid part of the Amount Financed at any time without penalty. If you do so, you must pay the earned and unpaid part of the Finance Charge and all other amounts due up to the date of your payment.

## 2. YOUR OTHER PROMISES TO US

**a.** If the vehicle is confiscated, damaged, or stolen. The following paragraph does not apply if the box in the GAP Waiver Notice on page 1 of this contract is checked. You agree to pay us all you owe under this contract even if the vehicle is confiscated, damaged, or stolen. The terms and conditions of your liability if the vehicle is confiscated, damaged, or stolen are described in a separate document you sign. The document is a part of this contract.

**b.** Using the vehicle. You agree not to remove the vehicle from the U.S. or Canada, or to sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission. You agree not to expose the vehicle to misuse, seizure, confiscation, or involuntary transfer. If we pay any repair bills, storage bills, taxes, fines, or charges on the vehicle, you agree to repay the amount when we ask for it.

**c.** Security interest. You give us a security interest in:
- The vehicle and all parts or goods put on it;
- All money or goods received (proceeds) for the vehicle;
- All insurance, maintenance, service, or other contracts we finance for you; and
- All proceeds from insurance, maintenance, service, or other contracts we finance for you. This includes any refunds of premiums or charges from the contracts.

This secures payment of all you owe on this contract. It also secures your other agreements in this contract. You will make sure the title shows our security interest (lien) in the vehicle. You will not allow any other security interest to be placed on the title without our written permission.

**d.** Insurance you must have on the vehicle. You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. You agree to name us on your insurance policy as loss payee. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance, we will tell you which type and the charge you must pay. The charge will be the premium for the insurance and a finance charge computed at the Annual Percentage Rate shown on page 1 of this contract.

If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce what you owe or repair the vehicle.

**e.** What happens to returned insurance, maintenance, service, or other contract charges. If we get a refund of insurance, maintenance, service, or other contract charges, we may subtract the refund from what you owe.

## 3. IF YOU PAY LATE OR BREAK YOUR OTHER PROMISES

**a.** You may owe late charges. You will pay a late charge on each late payment as shown on page 1 of this contract. Acceptance of a late payment or late charge does not excuse your late payment or mean that you may keep making late payments.

If you pay late, we may also take the steps described below.

**b.** You may have to pay all you owe at once. If you break your promises (default), we may demand that you pay all you owe on this contract at once subject to any right you have to reinstate the contract or less (see below). Default means:
- You do not pay any payment on time;
- You give false, incomplete, or misleading information during credit application;
- You start a proceeding in bankruptcy or one is started against you or your property; or
- You break any agreements in this contract.

The amount you will owe will be the unpaid part of the Amount Financed plus the earned and unpaid part of the Prepaid Finance Charge and the Finance Charge, any late charges, and any amounts due because you defaulted.

**c.** You may have to pay collection costs. If we hire an attorney who is not our salaried employee to collect what you owe, you will pay the attorney's fee and court costs as permitted by law. The maximum attorney's fee you will pay will be 15% of the amount you owe.

**d.** We may take the vehicle from you. If you default, we may take (repossess) the vehicle from you if we do so peacefully and the law allows it. If your vehicle has an electronic tracking device (such as GPS), you agree that we may use the device to find the vehicle. If we take the vehicle, any accessories, equipment, and replacement parts will stay with the vehicle. If any personal items are in the vehicle, we may store them for you. If you do not ask for these items back, we may dispose of them as the law allows.

**e.** How you can get the vehicle back if we take it. If we repossess the vehicle, you may pay to get it back. If two things are true, you have the right to get the vehicle back by paying all past due payments, any late charges, and any expenses we incurred related to retaking the vehicle, holding it, and preparing it for sale (reinstate). First, you must have bought the vehicle primarily for personal, family, or household use. Second, your only default is a failure to pay an installment payment on time. Otherwise, we will tell you how much to pay to get the vehicle back. Your right to get the vehicle back when we sell it.

**f.** We will sell the vehicle if you do not get it back. If you do not redeem, we will sell the vehicle. We will send you a written notice of sale before selling the vehicle.

We will apply the money from the sale, less allowed expenses, to the amount you owe. Allowed expenses are expenses we pay as a direct result of taking the vehicle, holding it, preparing it for sale, and selling it. Attorney fees and court costs the law permits are also allowed expenses. If any money is left (surplus), we will pay it to you unless the law requires us to pay it to someone else. If money from the sale is not enough to pay what you owe, you must pay the rest to us. If you do not pay this amount when we ask, we may charge you interest at a rate not exceeding the highest lawful rate until you pay.

**g.** What we may do about optional insurance, maintenance, service, or other contracts. This contract may contain charges for optional insurance, maintenance, service, or other contracts. If we demand that you pay all you owe at once or we repossess the vehicle, you agree that we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe or repair the vehicle. If the vehicle is a total loss because it is confiscated, damaged, or stolen, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe.

## 4. Used Car Buyers Guide.
The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract or sale.

Spanish Translation: Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.

---

112266·1·CLM-FI                          01/25/2025  08:49 pm

Buyer Initials X _____  Co-Buyer Initials X N/A _____          LAW 553-NY-eps-14 9/24 v1  Page 3 of 4

Scanned with